16477

JACOBY v. SOUTH CAROLINA STATE. BOARD OF NATURO-
PATHIC EXAMINERS

(64 S. E. (2d) 138)

Messrs. *C. T. Graydon and John Grimball,* of Columbia, for *Appellant,*

*Mr. Norbert A. Theodore,* of Columbia, *for Respondent,*

March 15, 1951.

TAYLOR, Justice.

The appellant, Myron D. Jacoby, was admitted to the practice of naturopathy in South Carolina on July 15, 1944, after taking an examination required by the South Carolina State Board of Naturopathic Examiners, and continued in active practice until December 1, 1948, when he was served with a rule to show cause why his license to practice naturopathy should not be revoked. After several hearings were held pursuant to this rule, the Board issued its order September 22, 1949, revoking appellant's license to practice in this state.

On November 4, 1949, the Honorable G. Duncan Bellinger issued a rule to show cause in the nature of a writ of

certiorari and a writ of supersedeas. The matter was heard before the Honorable T. B. Greneker, presiding Judge of the Fifth Judicial Circuit, who issued his order on April 11, 1950, affirming the action of the Board, and the matter now comes before this Court on appeal from this order, the exceptions to which present five questions as listed by appellant:

I. Should the action of the Board of Naturopathic Examiners, in revoking appellant's license to practice, be reversed because based upon illegal, incompetent, unlawful, and hearsay evidence?

II. Does the record show such bias and prejudice against the appellant on the part of the Board of Naturopathic Examiners as to require a reversal of its action in revoking appellant's license to practice?

III. Were not these matters and facts, with which the appellant was charged, previously passed upon by the Board of Naturopathic Examiners so as to make the questions and issues raised thereby *res judicata*?

IV. Did the Board of Naturopathic Examiners have the power to revoke appellant's license to practice?

V. Was there any evidence in the entire record to support the revocation of appellant's license to practice?

Before considering the facts of this case, it might be well to set out the pertinent parts of the several Acts of the General Assembly relating to the practice of naturopathy in South Carolina which are found in the acts of 1937, Act May 10, 40 Statutes, p. 441, the acts of 1941, Act April 18, 42 Statutes, p. 143, and the acts of 1949, Act June 7, 46 Statutes, p. 538, which are as follows:

"Section 1. Board of naturopathic examiners — appointment — term — meetings.—Be it enacted by the General Assembly of the State of South Carolina: There is hereby created a Board of Naturopathic Examiners to be known as the South Carolina Board of Examiners. Within thirty (30) days after this Act becomes a law, the South Carolina

Naturopathic Association shall recommend to the Governor, who shall appoint four (4) members, who shall be members of the South Carolina Naturopathic Association, and whose term of office shall be for a period of four (4) years. The appointees shall meet within ten (10) days after their appointment and organize by electing a President, Secretary and Treasurer, and adopting reasonable rules and regulations for the transaction of business and shall meet in June and November of each year.

"§ 2. License—issuance.—Any person of good moral character who has been continuously engaged in the practice of Naturopathy in the State of South Carolina for one (1) year prior to passage of this Act, but must be a graduate of a reputable school of Naturopathy, shall be licensed without an examination, upon payment of ten ($10.00) dollars, if he applies for a license within twenty (20) days after the organization of the Board, but hereafter all applicants must be graduates of a reputable college or school of Naturopathy and must stand examination before this Board.

"§ 3. License—duties of applicant—examinations.—All applicants must file with the Secretary of the Board, fifteen (15) days prior to its regular meeting time, proper credentials and a fee of ten ($10.00) dollars. In case the applicant fails in the first examination, he shall be entitled to a second examination at the next regular meeting of the Board.

"§ 4. Non-residents.—Any person of good moral character licensed by a Naturopathic Board of any other state whose requirements are commensurate with the requirements of this Board, upon the payment of twenty ($20.00) dollars shall be granted a license to practice in this State.

"§ 5. Revoke license.—Any practitioner who is found to no longer possess a good moral character may, in the discretion of the Board, have his license revoked.

"§ 6. Naturopathy defined.—Naturopathy is hereby defined to mean the use and practice of psychological, mechanical and material health sciences to aid in purifying, cleaning

and normalizing human tissues for preservation or restoration of health according to the fundamental principles of anatomy, physiology and applied psychology, as may be required. Naturopathic practice employs among other agencies, heat, light, water, electricity, psychology, diet, massage and other manipulative methods. These agencies are known as psycho-therapy, suggesto-therapy, hydro-therapy, electro-therapy, mechano-therapy, biochemistry, external appliances, mechanical and electrical appliances, hygiene, first aid, sanitation, helio-therapy and dietetics. *Provided, However,* That nothing in this chapter shall be held or construed to authorize any naturopathic physician licensed hereunder to practice *materia medica* or surgery, or shall the provisions of this chapter in any manner apply to or affect the practices of osteopathy, chiropractic, christian science or any other treatment authorized or provided for by law for the cure and prevention of diseases and ailments.

"§ 7.    Penalty.—Any person violating any of the provisions of this Act shall be deemed guilty of a misdemeanor and punishable in the discretion of the Court.

"§ 8.    Pay certain funds to public school fund.—If at the close of any fiscal year there remains in the hands of the Board more than five hundred ($500.00) dollars over and above all indebtedness, the same shall be turned over to the public school fund.

"§ 9.    All Acts or parts of Acts inconsistent herewith are hereby repealed.

"§ 10.    This Act shall take effect upon its approval by the Governor.

"Approved the 10th day of May, 1937".

"Section 1: Applicants for examination and license practice naturopathy—qualifications.—Be It Enacted by the General Assembly of the State of South Carolina: All applicants for examinations and licensure to practice Naturopathy in this State must be a graduate of a regular four years high school course and one year premedical course

and must have completed and hold a diploma from an accredited school, college or university of Naturopathy conferring the degree of Doctor of Naturopathy. Said college, school or university must be a Class A institution and recognized by the South Carolina State Board of Naturopathy Examiners and its professional training course shall constitute four years of nine months each, making a total number of four thousand four hundred (4,400) hours.

"Section 2: Fee.—All such applicants must file with the secretary of said Board at least fifteen days prior to its regular meeting time proper credentials and a fee of $25.00. In case the applicant fails to pass the examination he or she shall be entitled to a second examination at the next regular meeting of the said Board.

"Section 3: Non-residents.—Any person of good moral character licensed by a Naturopathic Board of any other State whose requirements are commensurate with the requirements of said Board upon the payment of Fifty ($50-.00) Dollars shall be granted a license to practice in this State without any further examination.

"Section 4: Practice of naturopathy defined.—The use and practice of phytotherapy, minor surgery, obstetrics, and gynecology, autotherapy and biologicals shall be made a part of and be included in the practice of Naturopathy.

"Section 5: Recognized school, college or university of naturopathy defined.—Any school, college or university legally chartered and having a regular professional course in Naturopathy and its allied branches of four years of nine months each, and includes in its curriculum the following subjects: Bacteriology, Anatomy, Diagnosis, Comparative Medicine, Physiology, Etiology, Hydrotherapy, Histology, Pathology, Phytotherapy, Biology, Toxicology, Electrotherapy, Chemistry, Hygiene and Sanitation, Massotherapy, Analysis, Biochemistry, Orthopedics, Symtomatology, Physiotherapy, Practice of Naturopathy, Autotherapy, Ethics and Jurisprudence, Dietetics, Gynecology and Obstetrics shall

be recognized by the South Carolina State Board of Naturopathic Examiners and the above requirements shall constitute the definition of a recognized school, college, university of Naturopathy.

"Section 6: Certificates sign—diseases report.—All Naturopathic physicians who are in active practice and licensed in this State shall have the authority to sign birth, death and health certificates and shall be required to report all infections and contagious diseases to the State Board of Health and shall be accorded the use of the State Biological and Chemical Laboratories.

"Section 7: Register.—All licensed Naturopathic physicians shall be required after receiving a certificate of qualification or license from the South Carolina State Board of Naturopathy Examiners to register in the County in which he or she resides with the Clerk of Court's office and pay a fee of fifty cents.

"Section 8: Subjects—examinations—business transact.—The South Carolina State Board of Naturopathic Examiners shall have the power and authority to name the branches of Naturopathy and its allied sciences in which the applicant for licensure shall be examined, and shall hold written or oral examinations or both, in the discretion of the Board. The Board shall also have power and authority to transact any business or legal matters pertaining to the practice of Naturopathy in this State.

"Section 9: Invalidity.—In the event that any provision or part of this Act shall be questioned in any Court and shall be held to be invalid the remainder of this Act shall not be invalid but shall remain in full force and effect.

"Section 10: Repeal.—All Acts or parts of Acts inconsistent herewith are hereby repealed.

"Section 11: Time effective.—This Act shall take effect upon its approval by the Governor.

"Approved the 18 day of April, 1941".

"Be It Enacted by the General Assembly ·of the State of South Carolina:

"Section 1: § 5231-19, 1942 Code, amended—board of naturopathic examiners suspend or revoke licenses—clauses —appeal. —Amend paragraph (2) of Subsection 19 of Section 5231 of 1942 Code of Laws of South Carolina by striking out paragraph (2) of said subsection and inserting in lieu thereof the following:

" '(2) The South Carolina State Board of Naturopathic Examiners shall have the power and authority, and is hereby authorized and empowered, to suspend or revoke, by a majority vote of its total membership, any license which may have heretofore been given under the provisions of this Act to any practitioner to practice naturopathy in South Carolina for any one or more of the following causes shown at a hearing before it, to wit: First, where any diploma, license, or certificate, illegally or fraudulently obtained by the applicant, or any other credentials, was presented to or filed with the Board and considered by it in granting a license to any practitioner; Second, where a license has been applied for and issued under an assumed name for the purpose of shielding dishonesty or criminal record; Third, the conviction of any criminal operation, or habitual drunkenness, or insanity, after the date of approval of this Act, or where one has been judicially adjudged by any competent court, or legally authorized commission to be insane; Fourth, where one has been guilty of any immoral or dishonorable conduct which would reflect upon his or her professional competency, or where the practitioner has become addicted to any harmful drug habit, or where he has conducted himself in such unprofessional manner as to bring discredit upon the profession; Fifth, upon the conviction of any practitioner of a felony or misdemeanor involving moral turpitude or professional dishonor in which case the record of the conviction, or a certified copy thereof, certified by the Clerk of Court and by the Judge in whose Court the conviction is had, shall be conclusive evidence.

" 'Whenever the Board shall have cause to believe that any license heretofore issued by it should be revoked, because of the existence of some ground for revocation as set forth in the above section, it shall be the duty of the Board to file or cause to be filed with the Secretary written charges against the accused, specifically setting forth the offense or offenses, acts or conduct complained of. A copy of said charges shall be forthwith delivered to the accused practitioner in person or by registered mail or left with some person of sound discretion at either his place of business or place of last known residence, either of which shall constitute sufficient notice to justify proceeding with a hearing of the charge. In addition to the delivery of a copy of the said charges, the Board shall, at the same time, advise the accused of the hour, day and place of hearing of said charges and warn him to be present, if he so desires, and to defend the action. The accused practitioner shall be permitted to be present in person and by attorney at the hearing and at the taking of all testimony relative to the charges. Any member of the Board is authorized and empowered to administer oath to all persons testifying at any such hearing. The accused shall be allowed at least ten (10) days from the date of such notice to him of the charges before being required to defend. It shall be the duty of the Board to receive reasonable evidence, whether for or against the accused, and the Board shall not be bound by the strict rules of evidence, as is required in a judicial court. The findings of facts of said Board shall be conclusive. The Board is charged to reach its findings and set forth its action thereon, and a certified copy of such findings, and action of the Board shall be served upon the accused practitioner. The practitioner, if he is dissatisfied, shall have the right to apply to the court of Common Pleas of the County in which he resides or practices for writ of certiorari, and the questions to be determined by the Court on such writ of certiorari shall be as is now provided by law, and the decisions of the Supreme Court of South Carolina.'

"Section 2: § 5231-23, 1942 Code, amended—qualifications of applicants for examination increased.—Amend paragraph one of subsection 23 of Section 5231 of the 1942 Code of Laws of South Carolina, by striking out the word 'one' between the words 'and' and 'year' on line three of said paragraph and insert in lieu thereof the word 'two', so that said paragraph one of said subsection 23 shall read as follows:

" '(1) All Applicants for examinations and licensure to practice naturopathy in this State must be a graduate of a regular four year high school course and two years premedical course and must have completed and hold a diploma from an accredited school, college or university of naturopathy conferring the degree of doctor of naturopathy. Said college, school or university must be a class A institution and recognized by the South Carolina State board of naturopathy examiners and its professional training course shall constitute four years of nine months each, making a total number of four thousand four hundred (4,400) hours. All such applicants must file with the secretary of said board at least fifteen days prior to its regular meeting time proper credentials and a fee of $25.00. In case the applicant fails to pass the examination he or she shall be entitled to a second examination at the next regular meeting of the said board.

"Section 3: § 5231-24, 1942 Code, amended—nonresidents.—To amend subsection 24 of Section 5231 of the 1942 Code of Laws of South Carolina, by striking out the word 'shall' between the words 'dollars' and 'be' on line four of said subsection and insert in lieu thereof the words 'may in the discretion of the board', so that said subsection 24 when so amended shall read as follows:

" 'Section 5231-24. Any person of good moral character licensed by a naturopathic board of any other State whose requirements are commensurate with the requirements of said board upon the payment of fifty ($50.00) dollars may, in the discretion of the board, be granted a license to practice in this State without any further examination.'

"Section 4: Repeal.—All or parts of Acts inconsistent with the provisions of this Act are hereby repealed.

"Section 5: Time effective.—This Act shall take effect upon its approval by the Governor.

"Approved the 7th day of June, 1949".

The original Rule of the respondent appears as follows:

"State of South Carolina
The South Carolina State Board
of Naturopathic Examiners
Columbia, S. C.
November 24, 1948

"To Dr. Myron J. Jacoby, Columbia, South Carolina:

"You will please take notice that the South Carolina Board of Naturopathic Examiners will meet at Columbia, South Carolina, Monday December 6, 1948, at the Jefferson Hotel at 10:00 A. M., at which time you will be required to show cause why your license to practice Naturopathy in South Carolina heretofore issued to you should not be revoked, on the grounds, that in your application for examination you made certain false representations, and that you do not have the qualifications necessary under the laws of the State of South Carolina to practice Naturopathy on the following particulars and grounds:

"(a) In your application Dated May 8, 1944, you stated that you were born on August 22, 1897, and on that date you were 47 years of age, and in the re-submission of your application under date 20th of May 1948, you stated that you were 54 years old.

"(b) That under your original application for examination which you filed with the Board in May of 1948, you stated that you graduated from the Edmar University College of Naturopathy at Greensburg, Pennsylvania, on the 11th of June, 1937, having attended there four years of nine months each, and having secured 4,550 hours of credit. When in fact, you were arrested on the 16th day of May, 1934, and indicted in the Court of General Sessions of the

City of New York, County of Kings, on the charge of Unlawful Practice of Medicine, and pleaded guilty on the 24th day of May, 1934, and sentenced to the New York City Penitentiary, and committed on the 28th day of May, 1934, and remained there until the 18th day of October, 1935, at which time you were released on parole and reported every two weeks until the 5th day of December, 1935, in person to the Parole Officer for the Parole Commission of the City of New York; that on the 5th day of December, 1935, you were returned to the New York City Penitentiary and remained there until the 2nd day of June, 1935, when you were re-paroled, and reported every two weeks thereafter in person to the same Parole Officer until the 27th day of May, 1937, during all of which period of time you resided at 2109-65th Street, Brooklyn, New York, with your mother, and during the time of your parole you were selling oil burners. That the evidence to establish the above will be a certified copy of the record of the Court of Special Sessions of the City of New York, Kings County, and Officer Brodkin of the Parole Commission of the City of New York.

"(c) That in your original application, you filed a letter from the Philadelphia College Infirmary of Osteopathy, dated June 18, 1943, stating that you had attended graduate sessions at that institution from February 9, 1942, to January 10, 1943, which letter was supposedly signed by one, Dr. John L. Hanson, when in fact such letter was a forgery, spurious, and a fraud. The evidence to be used to establish such, will be an Affidavit from Dr. Hanson, dated the 2nd day of August, 1948, together with other letters bearing his legitimate signature.

"(d) That with your original application, you stated that you obtained a Doctor of Philosophy degree in Psychology from the New York University, dated June 5, 1930, and supported same with a photostat of a letter from New York University Washington Square College, dated September 21, 1937, and proposedly signed by Adolph P. Link, and also presented a photostatic copy of a letter dated January 12,

1930 from the Washington Square College Chapter of New York University, supposedly signed by one, Harold T. Sands, Chancellor, stating that you were a member of the Washington Square College Chapter of Psi Chi National Honorary Society in Psychology, when in fact both of these letters were false and spurious and fictitious individuals, and that you were never a student at the New York University, that the name of Harold T. Sands is fictitious, that the Chancellor Washington Square Chapter of Psi Chi is fictitious, and at no time was there ever a student, or a professor, or anyone else at that institution by the name of Harold T. Sands. That Mr. Adolph P. Link was in 1937 an instructor in the Department of Psychology at Washington Square College, but was not then, nor at anytime, Chairman of the Department of Psychology at Washington Square College, and that the degree of Doctor of Philosophy in Psychology cannot be awarded by the Washington Square College, since it is an exclusive Under-graduate Division of the University. The proof to be offered is a letter from Mr. Presley D. Stout, dated 27th of July, 1948, Chairman of the Board of Psychology at the above institution.

"(e) Further, in your original application, dated the 8th of May, 1944, you stated under oath that you graduated from the Francis Academy, Manchester, New Hampshire High School, in 1915, under oath you stated that you graduated from the Eastern College, Manasas, Virginia, in 1915, with a degree of Bachelor of Science after completing a full four year course. One of which cannot be true, and the Eastern College has been closed for many years.

"(f) Further, in your second application, dated 20th of May, 1948, you stated under oath that you had completed 18 months of 3200 hours at the Pennsylvania Naturopathic College, and filed a certificate, dated the 11th day of September, 1934, when in fact, on that date you were confined at the New York City Penitentiary, and had been for some months. Proof of the foregoing is as set forth above.

"(g) Further, that under date of July 15, 1946, you executed under your signature, Credentials of Proposed Medical Examiner to the Atlantic Life Insurance Company, stating that you graduated from the Manchester University in England in 1915, attended the University of London for five years, graduating in 1920, and practiced for two and one half years at the Guy's Hospital, London, England, that you specialized in internal medicine, and were a member of the National Medical Society. If this be true, then the qualifications sworn to in the application referred to above are necessarily false and spurious.

"(h) That on March 15, 1926, you were indicted in the Court of Special Sessions in the City of New York under the name of Max Jacobi, charged with Petty Larceny, and that you pleaded guilty to such indictment on the 16th day of March, 1926, and were sentenced to the New York City Penitentiary on the 26th day of March, 1926. Proof of which will be established by a certified copy of the Court record from the above Court.

"You are hereby notified that at such Hearing you are invited to be present and be represented by counsel of your own choosing, if you so desire.

"South Carolina Board of Naturopathic Examiners."

The Order of Revocation issued by the Board appears as follows:

"State of South Carolina
The South Carolina State Board of
Naturopathic Examiners
Columbia, S. C.
September 22, 1949

"*In re:* The matter of. Dr. Myron D. Jacoby, Columbia, South Carolina.

"The above subject, Dr. Myron D. Jacoby, was issued a license to practice Naturopathy in South Carolina as a result of an examination in 1944. Thereafter this Board by reason of certain matters brought to its attention issued its

rule to the said Dr. Myron D. Jacoby, dated the 24th day of November, 1948, requiring him to show cause why his license to practice Naturopathy in South Carolina, heretofore issued to him, should not be revoked on the ground that in his application for examination before this Board he made certain false representations and that he did not have the qualifications as represented in his application; said note setting forth eight (8) grounds and required said Dr. Myron D. Jacoby to show cause before this Board on the 6th day of December, 1948, at 10:00 o'clock in the morning at the Jefferson Hotel, Columbia, South Carolina.

"Said notice was duly served on the said Dr. Myron D. Jacoby on the 1st day of December, 1948, as shown by the affidavit on the back of the original rule.

Hearings were held on the 6th day of December, 1948, on the 6th day of January, 1949, and on the 4th day of August, 1949. At the first hearing, Dr. Jacoby was represented by Mr. John Grimball, Mr. C. T. Craydon, his chief counsel being out of town; on the 6th day of January, 1949, he was represented by Mr. C. T. Graydon and Mr. John Grimball and on the 4th day of August, 1949, he was represented by Mr. C. T. Graydon. Although the record speaks for, itself and the testimony is transcribed, we will attempt to give a resume of the proceedings and testimony introduced in the matter. At the beginning of the inital hearing the members of the Board and the stenographer, who took the testimony, Mrs. Louise B. Wideman, were sworn, the usual oath being administered. Counsel for Dr. Jacoby inquired under what authority the Board was acting, whether under a Consurrent Resolution of the General Assembly or what statutory authority. He was informed that the Board was not acting pursuant to the Concurrent Resolution but by reason of powers of the Board under the enabling statute and amendments thereto."

The Rule to Show Cause above referred to and the affidavit of personal service upon Dr. Jacoby was offered in

evidence by counsel representing the Board and marked as Exhibit "1". Next was offered the original application for examination submitted to this Board by Dr. Jacoby on the 8th day of May, 1944, and attached thereto were a photostatic copy of a letter dated February 21, 1937, signed by one Adolph P. Link; a photostatic copy of a letter from the Psi Chi, Washington Square College Chapter, New York University, signed by Harold T. Sands, chancellor, dated June 12, 1930; photostatic copy of Diploma from Edmar University dated the 11th day of June 1937; photostatic copy of a letter dated June 18, 1943, from the Philadelphia College and Infirmary of Osteopathy, signed by Dr. John L. Hanson, custodian of records; and photostatic copy of certificate from the Psychological Testing Bureau, dated the 2nd day of April, 1938, signed by I. V. Committon, Director, same was received in evidence as Exhibit "2".

Next was offered the application signed by Dr. Jacoby, dated the 20th day of May, 1948, and attached thereto was a copy of the Psychologial Testing Bureau Certificate, dated April 2, 1938, signed by the said I. V. Committon; a statement signed by William C. Cook, registrar, of the Eastern College, Manasas, Virgina, dated September 8, 1915; Certificate of Attendance, Pennsylcania College of Naturopathy, dated the 11th day of September, 1934, signed by Dr. D. J. McDevitt, together with an undated letter attaching an affidavit, dated the 20th of May, 1948, and a photostatic copy of the same Diploma from Edmar University. This was received in evidence as Exhibit "3".

At this juncture counsel for Dr. Jacoby made certain admissions and denials with reference to these Exhibits. Thereafter Mr. Jacob Brodkin, a parole officer attached to the Parole Commission of the City of New York, was sworn and testified, all of which is reflected from the record. During his examination the letter dated October 27, 1935, signed by Myron Jacoby, was received in evidence, also a letter from the Warden at Welfare Island, New York City, dated De-

cember 4, 1935, was received in evidence under the objection of counsel for Dr. Jacoby and same is set forth in the record at page 10 of the testimony in the first hearing. During the examination the first page of the official parole records of the Parole Commission of the City of New York was offered and received in evidence as Exhibit "5".

At the close of the testimony of this witness counsel for Dr. Jacoby offered in evidence letters written by Mr. Norbert A. Theodore to different individuals relative to Dr. Jacoby and Mr. Theodore then offered the entire correspondence which was received in evidence marked Exhibit "6", and consisted of eight (8) letters addressed to Mr. Theodore and sent by him. This ended the first hearing and it was adjourned to meet at 10:00 A. M., January 6, 1949, at which time the Board did meet and at that time Mr. Graydon, counsel for Dr. Jacoby, placed every member of the Board on his *voir dire*. After each of the members of the Board was placed on his *voir dire,* Mr. Graydon entered a formal denial further that the matter was *res adjudicata*. Mr. Theodore then was sworn and explained what happened to the original application of Dr. Jacoby and why he unfastened them on several occasions. The letter dated 2nd of August, 1948, addressed to Dr. J. B. Branyon and signed by J. Leo Hanson was received by the Board. Next, letter from New York University dated 27th of July, 1948, addressed to Norbert A. Theodore, and signed by Presley D. Stout, was received in evidence by the Board. Next, was received in evidence information and extract copy from the minutes of the Court of Special Sessions of the City of New York, showing one "Max Jacobi" being convicted of larceny on the 26th day of March, 1926, and a certified extract from the minutes of the Court of Special Sessions of the City of New York, showing Myron D. Jacoby pleading guilty on the 28th day of May, and sentenced to the New York City Penitentiary, also the identification records of the police department of the City of New York and an application to the Atlantic Life Insurance Company signed by Dr. Jacoby.

Mr. Graydon, as the attorney for Dr. Jacoby, requested a thirty (30) day delay which was granted. The third hearing was held on the 4th day of August, 1949, at the Jefferson Hotel.

At the call of the hearing Mr. Graydon, counsel for Dr. Jacoby made a motion to dismiss the hearing on the ground that nothing has been proved of any matters or things done by Dr. Jacoby since the filing of his application and since the granting of his license. The Board refused to grant such motion.

Then began a series of examinations of practitioners who had received licenses from this Board and the sole purpose of the examinations was an attempt to besmear the characters of these witnesses and in the opinion of the Board such examinations were irrelevant. During the course of the examination of Dr. Garber, counsel for Dr. Jacoby offered in evidence letter written by Dr. Garber to this Board dated 6th of December, 1946. It is useless to go into all of the testimony that transpired subsequently.

Dr. Jacoby was duly sworn and his testimony is fully set forth in the record. During his testimony he offered an affidavit of Benton J. Pellitier, also a mimeographed copy of a letter sent out by this Board. It is noted that he testified at great length and on cross-examination, Mr. Theodore handed Dr. Jacoby a photostatic copy of letter dated November 8, 1941, addressed to the Superintendent of the New Hampshire State Hospital, Concord, New Hampshire, to which Dr. Jacoby stated that his signature was affixed and that he wrote same. He was also handed a copy of a letter dated May 9, 1948, addressed to "Dear Waldo" being Dr. Waldo Jones, and he admitted that he remembered writing it and that it was a copy of the original, same was offered in evidence over the objection of Counsel for Dr. Jacoby.

From all the facts and testimony before this Board as revealed by the record, we find:

"(a) That in his application dated May 8, 1944, Dr. Myron D. Jacoby, stated under oath that he was born on August 22, 1897, and on that date he was 47 years of age, and in the re-submission of his application under date of May 20, 1948, he stated that he was 54 years of age, and he swore during the hearing of August 4, 1949, that he was born on August 22, 1894; further on May 29, 1934, he signed a statement as "Max Jacobi" stating that he was 39 years of age, while in 1926, he gave his age as 24 years, to the Police Department, City of New York.

"(b) That in his original application for examination to this Board dated May 8, 1944, Dr. Myron D. Jacoby stated that he graduated from the Edmar University, College of Naturopathy, at Greensburg, Pennsylvania, on June 11, 1937, having attended there four (4) years of nine (9) months each and having secured 4,550 hours of credit. We find that he was arrested on May 16, 1934, and indicted in the Court of Special Sessions of the City of New York, County of Kings, on the charge of Unlawful Practice of Medicine, and pleaded guilty on the 24th of May, 1934, sentenced to the New York City Penitentiary, committed on May 28, 1934, and remained there until October 18, 1935, at which time he was released on parole, reported every two (2) weeks until December 5, 1935, in person to the Parole Officer for the Parole Commission of the City of New York; that on December 5, 1935, he was returned to the New York City Penitentiary and remained there until June 2, 1936, when he was reparoled, and reported every two (2) weeks thereafter in person to the same Parole Officer until May 27, 1937, and during such period of time Dr. Jacoby asserted that he resided at 2109-65th Street, Brooklyn, New York, with his mother, and that he represented and had others affirm that he was selling oil burners during that period of time. Further he signed a statement as 'Max Jacobi' for the said Parole Commission that from 1932 to 1934 for two years he was a Chemist at Kings County Hospital, Brooklyn,

New York. We find from this and other testimony in the case that Dr. Myron D. Jacoby never attended the Edmar University, College of Naturopathy and that the Diploma which he displays is not genuine.

"(c) That in his original application, dated May 8, 1944, Dr. Myron D. Jacoby filed a photostatic copy of a letter from the Philadelphia College and Infirmary of Osteopathy dated June 18, 1943, stating that he had attended graduate sessions at that institution from February 9, 1942 to January 10, 1943, which letter was supposedly signed by one Dr. John L. Hanson, we find that such letter was a forgery, spurious and false, and that Dr. Myron D. Jacoby never attended such college at any time.

"(d) That in his original application dated May 8, 1944, Dr. Myron D. Jacoby stated under oath that he obtained a Doctor of Philosophy degree in Psychology from the New York University, dated June 5, 1930, and supported same with a photostatic copy of a letter from New York University Washington Square College, dated September 21, 1937, and purportedly signed by Adolph P. Link, and also presented a photostatic copy of a letter dated January 12, 1930, from the Washington Square College Chapter of New York University supposedly signed by one, Harold T. Sands, Chancellor, stating that he, Dr. Myron D. Jacoby, was a member of the Washington Square College Chapter of Psi-Chi National Honorary Society in Psychology. We find that both of these letters were false and spurious and such purported signatures were forgeries and that no such persons were associated with those institutions and that Dr. Myron D. Jacoby was never a student at the New York University and that he never received any degree from that institution.

"(e) Dr. Myron D. Jacoby, in his original application dated May 8, 1944, stated under oath that he graduated from the Francis Academy, Manchester, New Hampshire, High School, in 1915, and in his second application he

stated under oath on May 20, 1948, that he graduated from the Eastern College, Manasas, Virginia, in 1915, with a degree of Bachelor of Science after completing a full four (4) year course. At page 39 in the testimony of the last hearing he re-asserted that he went to both of these institutions and graduated from them both. We find that one of these statements must of necessity be false.

"(f) That Dr. Myron D. Jacoby in his second application stated under oath that he had completed 18 months of 3,200 hours at the Pennsylvania Naturopathic College and filed a certificate, dated September 11, 1934 signed by one Dr. McDevitt. He was arrested and in jail before that time and signed a statement as "Max Jacobi" for the New York City Parole Commission that he was working continuously from 1924 through the time of his arrest in May of 1934, at Lewiston, Maine, Boston, Mass., and Brooklyn, New York. We find that he did not attend such college and that such statement is false.

"(g) Dr. Myron D. Jacoby did under date of July 15, 1946, execute and sign an instrument entitled "Credentials of Proposed Medical Examiner" to the Atlantic Life Insurance Company, stating that he had graduated from the Manchester University in England in 1915, also that he attended the University of London for five (5) years, graduating in 1920 and practiced for two and one-half years at Guy's Hospital, London, England, and that he specialized in internal medicine and was a member of the National Medical Society, also during the years 1942-1943 he was a contract physician at the various induction centers along the Eastern Seaboard and that his work consisted of making the various examinations required in selecting men for Army service. We find that all of these statements are and were false as were all of the statements he made regarding himself in his letter of November 8, 1941, addressed to Dr. Charles H. Dolloff. Supt. New Hampshire State Hospital, Concord, New Hampshire.

"(h) That on March 15, 1926, Dr. Myron D. Jacoby was indicted in the Court of Special Sessions in the City of New York under the name of Max Jacobi, charged with Petty Larceny and that he pleaded guilty to such indictment on the 16th day of March, 1926, and was sentenced to the New York Penitentiary on March 26, 1926.

"(i) That by reason of the foregoing, this Board finds that Dr. Myron D. Jacoby filed with this Board false and spurious credentials and perpetrated a fraud upon this Board and the people of the State of South Carolina. That he has no *bona fide* credentials nor has he any recognized qualifications to support a right to the privilege of practicing Naturopathy in this State and that he does not possess a good and moral character.

"It is therefore ordered, adjudged and decreed by the South Carolina State Board of Naturopathic Examiners that the license heretofore issued by this Board to Dr. Myron D. Jacoby, on or about the 15th day of July 1944, and being license certificate number 241, is declared to be null and void, and the same is hereby revoked, and that after this date and the proper service of a true copy of this Order upon him, he shall cease and desist from practicing Naturopathic medicine in this State and he is deprived of all the privileges and rights by reason of such license heretofore procured by the said Dr. Myron D. Jacoby from the South Carolina State Board of Naturopathic Examiners, and which was issued to him by said Board.

"South Carolina Board of Naturopathic Examiners"

Appellant first contends that the revocation of his license was based upon incompetent, illegal and hearsay evidence. This Court will not review the findings of fact of an inferior court or body on a writ of certiorari unless they are wholly unsupported by the evidence. A writ of certiorari is a common law remedy to correct errors of law of inferior jurisdictions and the writ will not lie to review errors or mistakes in matters of discretion. *Jennings v.*

*McCown*, 97 S. C. 484, 81 S. E. 963; *Wyse v. Wolfe*, 129 S. C. 499, 123 S. E. 818; *Davis v. State Board of Canvassers*, 86 S. C. 451, 68 S. E. 676.

In the case of *Smith v. Saye*, 130 S. C. 20, 125 S. E. 269, 282, this Court speaking through Mr. Justice Cothran states: "The facts as found by the board of canvassers are not open to controversy in proceedings by certiorari unless the findings are without evidence to sustain them. 'It is well settled that this court will not review the findings of fact of an inferior court or body, on writ of certiorari, unless they are wholly unsupported by the evidence.'"

In the comparatively recent case of *Feldman v. South Carolina Tax Commission*, 203 S. C. 49, 26 S. E. (2d) 22, 23, this Court stated:

"The law provides no mode of procedure for appeal from the order of the Tax Commission revoking the license of a retail liquor dealer. It is generally held, however, that the method of reviewing the action of a board or tribunal in revoking a liquor license is by writ of certiorari, upon the theory that while such bodies do not exercise the 'judicial power of the state,' as that phrase is used in conferring judicial power upon the courts of the state, they do exercise a *quasi* judicial power in such matters.

\* \* \*

"A writ of certiorari cannot be made a substitute for an appeal or writ of error, as seems to have been done in this case. We have held in numerous cases that this Court on writ of certiorari will confine its review to the correction of errors of law only, and will not review the findings of fact of an inferior Court or body except when such findings are wholly unsupported by the evidence. *McKnight v. Smith*, 182 S. C. 378, 189 S. E. 361; *Young v. Sapp*, 167 S. C. 364, 166 S. E. 354; *Smith v. Saye*, 130 S. C. 20, 125 S. E. 269; *State v. State Board of Canvassers*, 86 S. C. 451, 68 S. E. 676. Judges of the Courts of Common Pleas are bound by

the same rule and limitation. *Charles v. Byrd,* 29 S. C. 544, 8 S. E. 1; *State v. Fort,* 24 S. C. 510."

An administrative or *quasi* judicial body is allowed a wide latitude of procedure and not restricted to the strict rule of evidence adhered to in a judicial court. *Schwartz v. Mt. Vernon-Woodberry Mills,* 206 S. C. 227, 33 S. E. (2d) 517; *Strange v. Heath,* 212 S. C. 274, 47 S. E. (2d) 629.

Appellant objected to numerous exhibits such as copies of letters and photostatic copies of other exhibits, and it cannot be denied that many of these do not comply with any known rules of evidence even considering the liberality allowed *quasi* administrative bodies. However, an examination of the record discloses that some of the photostatic copies of letters which were objected to and now complained of by appellant were referred to in his original application and the items set forth therein, and the secretary of the Board testified that they were attached to and part of the original application filed by appellant, who denied this. It therefore became a question of fact for determination by the Board. Copies of several letters written by the secretary of the Board were introduced into evidence by appellant; whereupon respondent introduced into evidence the entire corrspondence and it is of this portion of the correspondence he now complains. Although he had previously been advised that such letters would be offered into evidence and he had had approximately one year in which to refute such charges, he offered no evidence designed to do so except his own testimony. When appellant was on the stand, he admitted writing a letter dated November 8, 1941, to Charles B. Dolloff, Superintendent, New Hampshire State Hospital, Concord, New Hampshire, in which he stated in substance that he had had extensive experience in psychiatrical work, having worked in institutional, commercial, legal and political psychiatry; that he owned and operated his own private mental hospital of forty beds near Stamford, Connecticut, and at-

tended clinics at the Neurological Institute and the Psychiatric Division of King's County Hospital; that he also conducted a course of instruction in mental hygiene at New York University; that in 1928 he was appointed to the Advisory Board of the Wickersham Commission and contributed that board's report on juvenile delinquency; that later he studied law at Fordham University, receiving his doctorate degree in Jurisprudence; that Governor Lehman nominated him to the legislature of the State of New York for a term of fourteen years, but this honor was declined because he did not possess a judicial mind. When questioned about this letter, he refused to answer contending that it had nothing to do with the matter before the Board. Considering that portion of the correspondence inadmissible as contended by appellant, without so deciding, there is an abundance of evidence to support the findings of the Board.

Appellant complains of the testimony of Dr. J. S. Garber, Dr. E. J. Bogan, Dr. Ruth Baker, Dr. J. F. Blondiau, Dr. E. R. Huffman. These witnesses were placed on the stand by appellant and he is bound by their testimony, even though it be unfavorable. Exceptions 9, 11, 12, 13, 14 and 15 are therefore overruled.

Appellant next contends that the record shows such bias and prejudice on the part of the Board of Naturopathic Examiners as to require a reversal of its action in revoking appellant's license and bases his contention upon the Board's having admitted during the hearing certain evidence, heretofore referred to, which it is contended is incompetent. Some of the correspondence referred to was introduced by appellant himself, whereupon Mr. Theodore, attorney for the Board, introduced the complete correspondence. Appellant also contends that certain witnesses who testified were clearly prejudiced against him. An examination of the record shows that appellant was fully informed of the nature of the letters, which were admitted into evidence, some time prior to the hearing and that he knew

that such correspondence would be used as part of the evidence to be presented to the board unless he could make some showing that the contents of these letters were untrue. The testimony of the witnesses complained of were witnesses whose testimony was placed in the record by appellant himself, and he is in no position now to complain. We are of the opinion that, although much of this testimony was incompetent, the admission of such is not sufficient to show that the Board was so prejudiced as to require a reversal of its action. In fact, counsel was given thirty days in which to obtain letters or evidence to offset the charges set forth in this evidence and stated: "If he can't get them in thirty days, he can't get them in thirty months." Exception 8 is therefore dismissed.

Appellant next contends that the entire matter was *res judicata*. Approximately two years prior to the hearing, respondent, an administrative body, discussed with appellant these charges which had been brought to the attention of the Board. No rule was issued and no attempt was made to adjudicate the matter in any respect. It is therefore unnecessary to cite any authority for the holding that none of the elements of *res judicata* are present in this case. Exceptions 6, 7 and 16 are therefore dismissed.

Appellant next contends that the Board of Naturopathic Examiners did not have the power to revoke appellant's license. From the several acts of the legislature, heretofore referred to, the respondent is the only body in this state which has the authority to issue a license to practice naturopathic medicine and also the only body to revoke such license. The Board, after the several hearings, based its findings on the evidence that appellant had received permission to stand an examination before it and had secured a license to practice naturopathic medicine on fraudulent and spurious evidence, and there is an abundance of evidence to support such findings. Licensing statutes sometimes provide that a license may be revoked for fraud, mis-

representation or concealment in its procurement—sometimes with the qualification that the fraud, misrepresentation, or concealment must be material. The courts, however, have held that the licensing authority has inherent power to revoke a license obtained by fraud or misrepresentation. The mere fact that one had been issued a license and practiced under it does not vest in appellant such right that would prevent the Board from thereafter revoking it for cause. *Harris v. State Board of Optometrical Examiners*, 287 Pa. 531, 135 A. 237; *Grime et al. v. Department of Pub. Inst. et al.*, 324 Pa. 371, 188 A. 337.

In the instant case, appellant was informed by the Board that his first application had been lost, and he was requested to file another, which he did. The Board, having in its possession the first application, proceeded to compare the two, which are dissimilar in practically every respect except the name, even the ages given do not coincide, all of which was considered by the Board in arriving at its conclusions. Appellant seeks to be excused for the many variances appearing therein on the grounds that the Board had dealt unfairly with him in requiring him to file a second application on the premise that the first application had been lost. Whether the first application was lost at the time the Board so notified appellant and later found, or knowingly in the possession of the Board at the time, we cannot say, but appellant's contention in this respect is untenable.

In the case of *Attorney General v. Gorson*, 209 N. C. 320, 183 S. E. 392, 395, we find:

"Two questions manifestly of grave importance to the people of this state as well as to the members of the bar of this state are presented by the record in this proceeding:

"1. Has this court the power to revoke a license to practice law in this state which this court has issued under statutory authority and in accordance with its rules, on the ground:

"(a) That at the time he applied for the license, the licensee fraudulently concealed from this court the fact that

he had been disbarred by the courts of another state in which he had been duly licensed to practice law, on the finding by the courts of said state that the applicant had been guilty of unprofessional conduct in his relations to his clients involving moral turpitude; or,

"(b) That at the time he applied for the license, the licensee falsely and fraudulently represented to this court that he had studied law in a law school in this state for two years, and had thereby qualified himself to take the examination by the Chief Justice and associate justices of this court, as prescribed by statutes and rules of this court in force at the time of his application for the license?

"2. If this court has the power to revoke the license on either ground, ought the power to be exercised by the court on the facts found by the committee of the bar, and approved by the court in the instant case?

"We are of opinion and so held that both questions must be answered in the affirmative. This court has the inherent power to revoke a license to practice law in this state, where such license was issued by this court, and its issuance was procured by the fraudulent concealment, or by the false and fraudulent representation by applicant of a fact which was manifestly material to the issuance of the license. In proper cases, it is the duty of this court, and this court will always exercise this power and thereby assure the people of this state, and the members of the bar that licensees who have fraudulently obtained the privilege of practicing law in this state, shall not enjoy such privilege when the fraud has been disclosed to this court, as in the instant case."

In the case of *Schireson v. Shafer*, 354 Pa. 385, 47 A. (2d) 665, 667, 165 A. L. R. 1133, the facts presented were somewhat similar to the one now before the court, and it was said there:

"Appellant questions the authority of the Board to revoke a license on the ground of fraud or misrepresentation where the statutory authority under which it acts does not enu-

merate these as grounds for revocation. While it is true that such legislation is penal in nature and must therefore be strictly construed: 41 Am. Juris., Physicians and Surgeons, section 44, it is also the general rule that where the license should never have been granted for reasons such as fraud or forgery, the licensing authority has the inherent power to revoke it: 41 Am. Juris., supra, section 48, page 175. "The power of the state to require a license implies the power to revoke a license which has been improperly issued": *Butcher et al. v. Maybury, D. C.,* 8 F. (2d) 155, 159. See also *Vanaman v. Adams,* 74 N. J. L. 125, 65 A. 204; *Martin v. Morris,* 62 N. D. 381, 243 N. W. 747; *Volp v. Saylor et al.,* 42 Or. 546, 71 P. 980. The appellate courts of this state have not passed on this question. Respectable opinion, however, supports the principal that where a license, such as this, was procured by fraud, it may be revoked by the licensing authority regardless of the fact that fraud is not specified as a ground for revocation in the statute. In the opinion of Deputy Attorney General Frederic W. Fleitz, a license to sell oleomargarine wrongly procured by a non-resident, could be revoked for fraud though the licensing statute did not so provide. See Revocation of Oleomargarine License, 1907-1908 Opinions of Attorney General 286. In an opinion by Deputy Attorney General J. E. B. Cunningham (later a judge of the Superior Court), a license to practice osteopathy could be revoked where the application for the license contained false information. In his opinion he states: 'In my opinion, your board (Board of Osteopathic Examiners) in addition to the express powers of revocation conferred upon it by the act creating it, has a general inherent power to revoke a license obtained by fraud': In re Practice of Osteopathy, 13 Dauph. Co. Rep. 302, 305. See also: In re Oleomargine License, 19 Pa. Dist. [R.] 927; *Commonwealth v. Briggs,* 34 Pa. Dist. & Co. R. 97. By the mere fact that he was once issued a license and practiced under it, appellant did not thereby acquire such vested right which would prevent the Board from thereafter revoking it for cause".

"Regarding as 'unprofessional conduct' the action of an applicant for a license to practice medicine in falsely stating or representing that the 'facts' set forth in certificates presented by him as showing his medical training were true the court, in *Rinaldo v. Medicial Examiners*, 1932, 123 Cal. App. 712, 12 P. (2d) 32, revoked a license issued to the applicant.

"Similarly, it has been held that a license to practice medicine was revocable in case of a false representation that the applicant was a graduate of a medical college. *Curryer v. Oliver*, 1901, 27 Ind. App. 424, 60 N. E. 364, 61 N. E. 593.

"Misrepresentations as to his preliminary education, made in applying for his license, were held, in *State ex rel. Horton v. Clark*, 1928, 320 Mo. 1190, 9 S. W. (2d) 635, to warrant revocation of a physician's license to practice medicine.

"And in an opinion by the attorney general, it was declared, in *Simmon's Case*, 1910, 38 Pa. Co. Ct. 195, that the board of osteopathic examiners had inherent power to revoke a license obtained by fraud, in that the licensee represented that he had attended osteopathic lectures for a period of twenty month, whereas the length of such period did not exceed ten months. A similar opinion was handed down by the attorney general in Re Practice of Osteopathy, 1910, 13 Dauph. Co. Rep., Pa, 302.

"A license to practice medicine procured through the presentation of a pretended diploma from a fraudulent medical college, without an examination, will be revoked and canceled in a proper proceeding. *Gulley v. Territory*, 1907, 19 Okl. 187, 91 P. 1037.

"A license to practice medicine was revoked on the ground of fraud, in *Mower v. State Dept. of Health*, 1928, 108 Conn. 74, 142 A. 473 (appeal dismissed in 1928, 278 U. S. 570, 49 S. Ct. 82, 73 L. Ed. 511), in which the court upheld contentions that representations, in an application for a license to practice medicine, that the college of which the applicant claimed to be a bona fide graduate was a reputable

institution, and that it required a course of study of eclectic medicine of not less than two years, were false and fraudulent, and that the license of the applicant was procured by the fraud so practiced."

We are of opinion that respondent was the only administrative body in this state that could initiate the proceedings in this case and the only body which had the authority to revoke appellant's license, that appellant was granted every opportunity to present any evidence which he desired. He was represented by able counsel and every legal step was taken to protect his interest. Exceptions 1 and 4 are dismissed.

The question of whether or not there was sufficient evidence in the record to support the revocation of appellant's license as presented by exceptions 2, 3, 5 and 10 has heretofore been discussed and is also dismissed.

We are of the opinion that the order appealed from should be affirmed, and it is so ordered.

FISHBURNE, STUKES and OXNER, JJ., and A. L. GASTON, A. A. J., concur.