THIS OPINION HAS NO PRECEDENTIAL VALUE

THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT
BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING
EXCEPT AS PROVIDED BY RULE 239(d)(2), 
 SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
Edna L. Calhoun,       
Appellant,
 
 
 

v.

 
 
 
Marlboro County School District,       
Respondent.
 
 
 

Appeal From Marlboro County
A. Victor Rawl, Circuit Court Judge

Unpublished Opinion No. 2004-UP-505
Heard September 16, 2004  Filed October 
 8, 2004

AFFIRMED

 
 
 
W. Allen Nickles, III, Carl L. Solomon and Dona L. Guffey, 
 all of Columbia, for Appellant.
Shirley M. Fawley, Vernie L. Williams and Kenneth L. Childs, 
 all of Columbia, for Respondent.
 
 
 

 
PER CURIAM:  Dr. Edna L. Calhoun appeals 
 the order of the circuit court affirming the decision of the Marlboro County 
 School District Board (Board) not to renew her teaching contract.  We affirm.
FACTS/PROCEDURAL HISTORY
Calhoun taught in various Marlboro County schools 
 for nearly fifty years.  Her most recent tenure was as a social studies teacher 
 at Marlboro County High School (MCHS), which was located in the Marlboro County 
 School District (District).
Rocky E. Peterkin became principal of 
 MCHS in 1999.  During the course of the 1999-2000 school year, he observed the 
 teaching performance of the MCHS faculty members.  While observing Calhouns 
 teaching performance in the Fall of 1999, Peterkin developed significant concerns 
 about the quality of Calhouns teaching performance, including the method by 
 which [her] lesson plans were planned and implemented  how objectives did not 
 always mesh with the lessons being taught, and  about the lack of a verified 
 teachers strategies (sic) to meet the needs of all students. 
Consequently, he met with Calhoun in December 1999 
 to advise her of his concerns and make her aware that in the spring 2000 semester 
 he intended to put her on a professional development plan with [the] full intent 
 that the plan support and strengthen her abilities to teach.  Peterkin wrote 
 Calhoun in January 2000 to reiterate that a professional development plan 
 would be devised for her implementation during the second semester of the 1999-2000 
 school year and that the purpose of this plan is to provide additional administrative 
 support for [her] classroom instruction.  
The three-page development plan provided focus 
 on the dual goals of improving Calhouns Instruction Presentation and Facilitating 
 Instruction skills.  Within each goal, the plan included specific objectives 
 and activities designed to achieve the objectives.  Descriptions of appropriate 
 evidence that Calhoun had completed the activities were provided, as well as 
 descriptions of relevant resources available to help Calhoun complete the activities, 
 and completion dates for each activity.  Additionally, Calhoun was assigned 
 to participate in Cooperative Learning Sessions to help improve her teaching 
 skills. 
Throughout the spring 2000 semester, a team of 
 District and MCHS administrators observed Calhouns teaching performance and 
 efforts to comply with the development plan.  Based on those observations, Peterkin 
 determined Calhoun had not satisfactorily improved her teaching performance, 
 and notified District superintendent Dr. Ray Brayboy of his concerns.   
In an April 3, 2000 letter, Brayboy informed Calhoun 
 that Peterkin and she were to meet and develop an improvement plan for Calhoun 
 to pursue in the 2000-2001 school year.  Brayboy further informed Calhoun that 
 Peterkin would also be monitoring and evaluating [her] performance to see that 
 the necessary improvements are made.  He added, Your failure to address these 
 concerns could place your continued employment with this District in jeopardy. 

Peterkin met with Calhoun on April 6, 2000, after which 
 he summarized their meeting in a written letter to Calhoun.  In the letter, 
 Peterkin wrote:

This letter is a follow-up to our conference on April 6, 
 2000, in which I shared with you my serious concerns with your overall teaching 
 performance.  In particular, we discussed my continued reservations regarding 
 your long- and short-range planning, delivery of instruction in accordance with 
 District expectations, treatment of and communications with students, classroom 
 environment, and classroom management skills.

Peterkin added that, based on observations of Calhouns 
 teaching performance, he saw a continued need for improvement, and that she 
 would be provided with an Improvement Plan to assist her.  He added that [s]hould 
 [she] fail in the upcoming year to complete successfully the S.T.E.P. process 
 [1] or to demonstrate significant improvement in [her] teaching performance, 
 [her] continued employment with this District may be in jeopardy. 
Peterkin later provided Calhoun with a detailed 
 improvement plan for the 2000-2001 school year, which was designed to strengthen 
 identified teaching deficiencies.  In a May 25, 2000 letter from Peterkin to 
 Calhoun, he noted that she was given the plan because of concerns about [her] 
 overall teaching performance in the areas of accommodating the needs of special 
 education students enrolled in [her] classes, delivery of instruction, time 
 on task by [her] students, and classroom management.  Peterkin sought to meet 
 with Calhoun to discuss the plan and any revisions she wanted to make to the 
 plan.  He reiterated his earlier warning that if significant improvement in 
 your job performance is not noted, your continued employment with this District 
 will be in jeopardy.
During the 2000-2001 school year, Calhouns teaching 
 performance was evaluated under the S.T.E.P. plan by Peterkin and Assistant 
 Principal Sequal Black.  Among other things, they observed that Calhoun was 
 not following lesson plans, students were allowed to copy answers from their 
 textbooks during tests, and that students were permitted to chose whether to 
 even take social studies tests.  Of particular concern to Black were observations 
 that the needs of special education students were not being met as required 
 by federal law.  Calhouns preliminary S.T.E.P. evaluation results for the 2000-2001 
 school year were unsatisfactory with nine subsections rated professional 
 and six rated as needs improvement.  Peterkin provided a formal, written remediation 
 plan to address Calhouns teaching areas deemed unsatisfactory.  The plan included 
 suggested professional readings, staff development training, and other specific 
 ideas for improvement.
In spite of Calhouns unsatisfactory results 
 on the S.T.E.P. evaluations, Peterkin recommended to Superintendent Brayboy 
 that for the 2001-2002 school year Calhoun receive a third opportunity to improve 
 her overall teaching performance.  Peterkin recommended continued assistance 
 and a second formal S.T.E.P. evaluation for the 2001-2002 school year.  
Brayboy accepted Peterkins recommendations.  He 
 advised Calhoun by letter dated April 5, 2001 that the District would renew 
 her contract for the 2001-2002 school year, but that ongoing, serious concerns 
 about her teaching performance motivated the District to continue formal evaluation 
 of her teaching performance during the year.  He again noted that the District 
 expected significant and consistent progress in improving [her] overall teaching 
 performance, and that failure to do so satisfactorily would put her continued 
 employment with the District in jeopardy.
For the 2001-2002 school year, Calhouns S.T.E.P. 
 evaluation team consisted of District administrators Mildred Baker and Herbert 
 Gould, a former MCHS principal.  Throughout the year, Calhoun was observed and 
 provided written and oral assistance.  However, in the December 2001 initial 
 review of her S.T.E.P. evaluation, she again received an unsatisfactory evaluation 
 of her performance including professional ratings on ten S.T.E.P. subsections 
 and needs improvement ratings on five subsections.  
Consequently, Baker, Gould, and Peterkin met with 
 Calhoun for approximately three hours in December 2001 to review her results 
 and provide Calhoun a written remediation plan with specific objectives, strategies, 
 and deadlines.  The District gave Calhoun a resource notebook with materials 
 prepared to help her with her classroom teaching.  However, Calhoun returned 
 the binder to Bakers office, stating she was not going to read the stuff 
 in the binder.  In a written letter from Baker to Calhoun on February 4, 2002, 
 Baker expressed her disappointment in Calhouns disregard of the resource notebook, 
 and detailed examples of Calhouns noncompliance with several requirements of 
 the remediation plan.  Ultimately, Calhoun failed to complete the majority of 
 the remediation plan recommendations. 
On March 8, 2002, Gould and Baker again 
 met with Calhoun to review their final 2001-2002 S.T.E.P. evaluation results.  
 Calhoun received an overall rating of unsatisfactory with six subsections 
 rated professional and nine subsections rated needs improvement.  During 
 the conference, Gould reviewed each category of evaluation.  They asked Calhoun 
 if there was anything she wanted Baker or him to address, and whether they could 
 do anything further to assist her.  She responded that she thought she was doing 
 what was expected of her.
Based on Calhouns two final unsatisfactory 
 S.T.E.P. evaluations and  his personal evaluation of Calhoun, Peterkin recommended 
 to Superintendent Brayboy that Calhoun not be given a teaching employment contract 
 for the 2002-2003 school year.  Brayboy agreed, and notified Calhoun in an April 
 1, 2000 letter that he had recommended to the Board that her contract not be 
 renewed.
In response to Brayboys recommendation, 
 the Board conducted a review and held a hearing to review whether Calhouns 
 contract should be renewed.  At the hearing, all parties were represented by 
 counsel.
Peterkin, Gould, Baker, and Black each detailed 
 numerous examples of how over a two-and-a-half year period Calhoun received 
 repeated written notices concerning alleged deficiencies about her teaching 
 performance.  This testimony further indicated the following: (1) Calhoun was 
 given remedial programs that she largely ignored or failed to complete; and 
 (2) Calhoun was subject to comprehensive informal and formal evaluations that 
 consistently indicated her teaching performance was generally unsatisfactory 
 with little signs of improving.  
During the hearing, Calhoun testified 
 that prior to Peterkins initial expression of concern about her teaching performance 
 in the fall of 1999, at least one other principal had expressed major concerns 
 about her teaching.  When asked if she had communication problems with Peterkin, 
 she only replied, Well, hes a friendly person, but he seems to be busy.  
 When asked, isnt it true that over the past two-and-a-half years Mr. Peterkin 
 and others have provided you with either remediation plans or improvement plans 
 designed to help you improve your teaching, Calhoun responded Yes. But the 
 suggestions that they were making that I should attend to, I felt I was doing 
 that thoroughly.  The thrust of the evidence offered by Calhoun was that she 
 was properly responding to the remediation efforts.
The Board decided not to renew Calhouns 
 teaching contract for the 2002-2003 school year, thereby adopting the superintendents 
 recommendation.  She appealed the decision of the Board to the circuit court, 
 which affirmed.  This appeal follows.
STANDARD OF REVIEW
The scope of review that applies to cases brought 
 under the Teacher Employment and Dismissal Act is limited to whether the grounds 
 given for termination of employment are supported by substantial evidence.  
 Hendrickson v. Spartanburg County Sch. Dist., 307 S.C. 108, 110, 413 
 S.E.2d 871, 872-73 (Ct. App. 1992).    Substantial evidence is not a mere scintilla 
 of evidence nor the evidence viewed blindly from one side of the case, but is 
 evidence which, considering the record as a whole would allow reasonable minds 
 to reach the conclusion the administrative agency must have reached in order 
 to justify its action.   Id., 307 S.C. at 110-11, 413 S.E.2d at 873.
DISCUSSION
I.
Calhoun first argues that the Board failed to enforce 
 her legal right to receive written notice of perceived deficiencies and an opportunity 
 to improve.  We disagree.
South Carolina Teacher Employment and Dismissal Act 
 (the Act) governs the employment and dismissal of all continuing contract teachers 
 in the South Carolina public school system.  Among other things, it empowers 
 school boards to employ teachers and to discharge them when good and sufficient 
 reasons for doing so present themselves.  S.C. Code Ann. § 59-19-90(2) (1976).  
 Here, Calhoun was terminated pursuant to two portions of the Act.  The first 
 provides:

[a]ny teacher may be dismissed at any time who shall 
 fail, or who may be incompetent, to give instruction in accordance with the 
 directions of the superintendent, or who shall otherwise manifest an evident 
 unfitness for teaching; provided, however, that notice and an opportunity 
 shall be afforded for a hearing prior to any dismissal. Evident unfitness for 
 teaching is manifested by conduct such as, but not limited to, the following: 
 persistent neglect of duty, willful violation of rules and regulations of district 
 board of trustees .

S.C. Code Ann. § 59-25-430 (1976) (emphasis removed).  
 The second part of the Act upon which the Board based its termination provides:

[w]henever a superior, principal,  or supervisor charged with 
 the supervision of a teacher finds it necessary to admonish a teacher for a 
 reason that he believes may lead to, or be cited as a reason for, dismissal 
 or cause the teacher not to be reemployed he shall: (1) bring the matter in 
 writing to the attention of the teacher involved and make a reasonable effort 
 to assist the teacher to correct whatever appears to be the cause of potential 
 dismissal or failure to be reemployed and, (2) except as provided in 
 § 59-25-450 [2] , allow reasonable 
 time for improvement.

S.C. Code Ann. § 59-25-440 (1976) (emphasis added).
In the present case, Calhoun received numerous written 
 and oral warnings over nearly a three-year period, beginning in the fall of 
 1999.  By her own admission, Peterkin provided Calhoun a written notice of his 
 concerns about her teaching performance and parent complaints as early as January 
 2000.  Furthermore, Calhoun does not dispute that for a two-and-one-half 
 year period preceding the Boards decision not to renew her contract, Peterkin 
 and others provided her with either remediation plans or improvement plans 
 designed to help  improve [her] teaching. Rather, she expressed a belief that 
 she was thoroughly addressing their suggestions.  In essence, she offers no 
 indication that, given more time to improve, she would alter her performance 
 in any way.  We find that sufficient evidence exists to establish that Calhoun 
 received sufficient written notice of alleged deficiencies with her performance, 
 more than reasonable assistance by MCHS to help her correct the alleged deficiencies, 
 and a reasonable amount of time to demonstrate improvement in the areas of alleged 
 deficiencies. 
II.
Calhoun next argues that the Act gives rise to a fiduciary 
 duty that the Board breached by allowing her to be evaluated by an allegedly 
 flawed process.  We acknowledge  as does the District  that a school board 
 owes a general duty of good faith and fair dealing consistent with the procedures 
 and mandates of the Act.  We, however, need not reach the question of whether 
 the Act creates a separate and independent fiduciary duty, for Calhoun has failed 
 in any event to establish a breach of any such duty. 
 [3] 
One alleged flaw in the evaluation process, according 
 to Calhoun, is that past comments allegedly made by S.T.E.P. evaluator Baker 
 suggested her bias against Calhoun.  However, Calhoun offers no evidence of 
 actual bias on Bakers part.  We thus find no merit to this argument.  See 
 Green v. Clarendon County School Dist. Three, 923 F.Supp. 829, 846 (D.S.C. 
 1996)(stating that the nebulous concept of a probability of unfairness[] 
 is not sufficient proof of actual bias). 
The second alleged flaw stems from evaluator Blacks 
 testimony that she had secret concerns about Calhouns performance that were 
 not reflected on Calhouns 2000-2001 evaluation.  Calhoun contends this violated 
 the Acts requirement that she receive written notice and remediation.  We have, 
 however, determined, as noted above, that Calhoun otherwise received sufficient 
 notice, remediation guidance, and time to demonstrate improvement over a two-and-one-half 
 year period prior to the decision of the Board not to renew her contract.  A 
 review of the record demonstrates that the ultimate decision of the Board was 
 based on the cumulative effect of all facts and circumstances surrounding Calhouns 
 persistent pattern of noncompliance with the remediation plans.  There was no 
 substantial reliance on the so-called secret concerns of Black.  We find no 
 breach of the Act or purported fiduciary duty.  
III.
Calhoun contends the District 
 failed to prove its case before the Board because the District relied, in part, 
 on hearsay evidence of parent and student complaints regarding her teaching 
 performance.  In doing so, Calhoun argues the Board, in allowing such testimony, 
 violated her Constitutional rights.  We disagree.
It is well established 
 that school board hearings under the Act are quasi-judicial administrative 
 hearings.  See e.g., Laws v. Richland County School Dist. No. 
 1, 270 S.C. 492, 243 S.E.2d 192 (1978).  The rules of evidence do not strictly 
 apply to teacher dismissal hearings.  Richards v. City of Columbia, 227 
 S.C. 538, 552, 88 S.E.2d 683, 689 (1955) ([E]ven without the aid of statute 
 it is held that an administrative or quasi-judicial body is not governed by 
 the ordinary legal rules of evidence);  Jacoby v. S.C. State Bd. Of Naturopathic 
 Examiners, 219 S.C. 66, 90, 64 S.E.2d 138, 149 (1951) (An administrative 
 or quasi judicial body is allowed a wide latitude of procedure and not restricted 
 to the strict rule of evidence adhered to in a judicial court.).  Thus, we 
 find no error in the admission of hearsay evidence regarding parent and teacher 
 complaints. [4]   
IV.
Finally, Calhoun argues that the Board failed to 
 objectively determine if good and just cause had been proven to support the 
 Boards decision not to renew her employment contract.  Calhoun maintains that 
 the Board refused to view the record in its entirety and disregarded testimony 
 favorable to Calhoun provided by one of Calhouns fellow faculty members, two 
 of Calhouns former students, and Calhouns sister.  Calhoun essentially urges 
 us to discredit the evidence relied upon by the Board. 
The ultimate inquiry is whether substantial evidence 
 supports the Boards decision.  We find substantial evidence in the record to 
 support the Boards decision to terminate Calhoun.  We emphasize that our limited 
 standard of review precludes fact-finding on our part.  Having concluded that 
 the Boards decision is supported by substantial evidence, we are constrained 
 to affirm.   In so holding, we in no way diminish Dr. Calhouns lengthy and 
 laudable career in public education.
AFFIRMED.
HEARN, C.J., HUFF and KITTREDGE, JJ., concur.

 
 
 [1]    S.T.E.P. was a formal teacher evaluation process used 
 by District at the time.  

 
 
 [2]    Section 59-25-450 provides for the immediate suspension 
 of teachers in limited circumstances.  S.C. Code Ann. § 59-25-450 (1976).

 
 [3]   
 Calhoun cites Armstrong v. Sch. Dist. Five of Lexington County Richland 
 Counties, 26 F.Supp.2d. 789 (D.S.C. 1998) for the proposition that school 
 districts serve in a fiduciary capacity in matters related to teacher rights 
 and benefits.  We find Armstrong inapposite, for the imposition of 
 a fiduciary duty there concerned only the administration by the school district 
 of accrued employee benefits.  

 
 
 [4]     Even assuming that the admission of hearsay evidence was erroneous, 
 we find the error not prejudicial to Calhoun in light of the non-hearsay evidence 
 supporting the Boards decision not to renew Calhouns contract.