17032

CLARENCE RICHARDS *ET AL.*, Appellants, v. CITY OF CO-
LUMBIA *ET AL.*, Respondents

(88 S. E. (2d) 683)

*Messrs. Townsend M. Belser, Fred D. Townsend,* and *John Grimball,* of Columbia, for *Appellants,*

*Messrs. Paul A. Cooper, City Attorney,* and *D. W. Robinson, Jr.,* and *James F. Dreher,* of Columbia, *for Respondents,*

542

July 18, 1955.

STUKES, Justice.

In 1939 the General Assembly passed an act entitled, quoting: "To Authorize Cities and Towns Having a Population of More Than Five Thousand Inhabitants to Adopt Ordinances Relating to the Repair, Closing and Demolition of Dwellings Unfit for Human Habitation; and to Provide for the Remedies and Procedure in Connection With Action Taken Under Such Ordinances." 41 Stat. 347. With subsequent amendments it appears as sections 36-501 *et seq.* of the Code of 1952 and supplement. Pursuant to this statute the City Council of Columbia, the largest city in the State, enacted, after years of investigation, an ordinance on May 26, 1954, providing for the repair, alteration, improvement, vacation, closing or demolition of dwellings or dwelling units unfit for habitation, which was the title of the ordinance. Section 1 of it follows:

"The City Council of the City of Columbia, South Carolina, finds and hereby declares that there exist within the corporate limits of the City dwellings and dwelling units which are unfit for human habitation due to dilapidation, defects increasing the hazards of fire, accident or other calamities, lack of ventilation, light or sanitary facilities or other conditions rendering such dwellings and dwelling units unsafe or unsanitary, dangerous or detrimental to the health, safety or morals or otherwise inimical to the welfare of the residents of the City."

Section 2 contains appropriate definitions of certain terms which are used in the ordinance.

Section 3 sets up the enforcing agency which is called the Commission for Urban Rehabilitation, composed of five qualified electors of the city appointed by the Mayor with the approval of Council for terms of five years after the first staggered terms of the initial appointees, subject to termination at the pleasure of Council and the Mayor and Council are empowered to fill vacancies. The duties of the Com-

mission are set forth to be to formulate policies for the effectuation of the ordinance, to administer oaths and examine witnesses, hear testimony and make findings and orders thereon in cases of disagreement between a property owner or his agent and the Rehabilitation Director. Section 4 of the ordinance establishes the position of Rehabilitation Director and authorizes assistants who shall investigate dwellings in the City to determine which are unfit for human habitation, and, quoting,

"To enter upon premises for the purpose of making examinations, provided that such entries shall be made in such manner as to cause the least possible inconvenience to the persons in possession."

Section 5 of the ordinance provides that when a petition is filed with the Director by a public authority or at least five residents of the City charging that any dwelling is unfit, or when it so appears to the Director, after preliminary investigation, which discloses basis for the charge, he shall issue and cause to be served upon the owner of, and all parties in interest in, such dwelling a complaint stating the charges and with notice that if a hearing is requested by the owner such will be held before the Commission not less than ten days, nor more than thirty days, after service. The owner and other parties in interest are given the right to file an answer in person or otherwise and give testimony at the hearing. This section concludes as follows: "The rules of evidence prevailing in courts of law or equity shall not be controlling in hearings before the Commission."

In section 6 it is provided that if the Commission determines after hearing that the dwelling in question is unfit for human habitation, it shall state its findings of supporting facts in writing and shall issue and serve upon the owner an order requiring him, within a specified time, to repair, alter, or improve the dwelling to render it fit or to vacate, close for habitation or demolish the dwelling. In a case where there is no hearing, the order shall be similarly prepared and served on the owner.

Methods of service of complaints and orders are provided in section 7, as to which there is no present question.

Section 8 provides that if there is failure of compliance to repair, etc., the Director shall close the dwelling and post at the entrance a notice, in effect, that it is unfit for human habitation and its use or occupation therefor is prohibited and unlawful.

Because of its importance in the controversy section 9 of the ordinance is copied in full, with added emphasis on certain of its provisions which will be later discussed:

"Section 9. Standards of Dwellings or Dwelling Units Fit for Human Habitation. *The Commission and/or the Rehabilitation Director may determine that a dwelling or dwelling unit is unfit for human habitation if conditions existing in such dwelling or dwelling unit are dangerous or injurious to the health, safety or morals of the occupants of such dwelling or dwelling unit, the occupants of neighboring dwellings or other residents of the City.*

"*Without limiting the generality of the foregoing* the following conditions are hereby declared essential to make a dwelling fit for human habitation:

"A. Inside running water connected to a kitchen sink, and to a lavatory or laundry sink, and to a bathtub or shower, and to a toilet, all connected to the public sewer, or other disposal approved by the City Board of Health;

"B. Adequate screens and glass panes for all doors and windows;

"C. Fireplaces, flues, or other provisions for heating to afford reasonable comfort;

"D. A window in each living room and bedroom which opens not less than 45% of its area and can be effectively opened and closed as a means of ventilation;

"E. Electrical wiring system connected and installed in accordance with the electrical ordinance of the City.

"F. Privacy for toilet and tub or shower, effectively ventilated.

"G. The roof, flashings, exterior walls, basement walls, floors and all doors and windows exposed to the weather constructed and maintained so as to be reasonably weather tight and water tight, and sound and safe, and capable of affording privacy.

"*In addition to the foregoing, a dwelling unit may be found to be unfit for human habitation if there are defects therein increasing the hazards of fire, accident, or other calamities, conditions making the structure unsafe, unsanitary, or failing to provide for decent living or which are likely to cause sickness or disease.*"

Section 10 provides penalties for violations of stated terms of the ordinance which are enforceable in the court of the City Recorder in which, incidentally, the right to trial by jury obtains.

Section 11 makes the provisions of the ordinance cumulative to other appropriate remedies of the City provided by State laws or other ordinances.

Section 12 is a separability provision wherein the legislative intent of Council is declared that if any provision of the ordinance or the application of it under any circumstances is held invalid, the remainder of the ordinance and the application of it under other circumstances shall not be affected.

Action was brought by the appellants to enjoin the enforcement of the ordinance for invalidity upon various constitutional grounds which will be discussed *seriatim* as they are presented in the brief. The first named appellant testified that he is the owner of over a hundred dwellings in the city which he rents to tenants and about seventy-five of them are not equipped as required by the terms of the ordinance. The other appellant is the owner of two sub-standard residences, one of which he and his wife occupy and the other he rents to a tenant. Both appellants testified that none of the property is subject to mortgage.

After hearing the evidence and arguments the trial court overruled all of the grounds of attack upon the ordinance and upheld it as valid and constitutional, whence this appeal.

It is first contended by appellants that the ordinance ■ permits the taking of their property without due process and denies to them the equal protection of the law. The evidence was that the expense of improving the sub-standard houses of appellants to meet the requirements of the ordinance would run from $575.00 to $750.00 per dwelling. In that connection, the following from the opinion in *Arnold v. City of Spartanburg,* 201 S. C. 523, 23 S. E. (2d) 735, 741, is pertinent: "Furthermore, we find no merit in the contention of the plaintiffs that the enforcement of the ordinance will result in financial loss to them, as affecting the validity of the ordinance. In the case of *City Council of Charleston v. Wentworth Street Baptist Church* [4 Strob. 306], it was held that in this State the law will never, by any construction, advance a private interest to the destruction of a public interest; but, on the contrary, that it will advance the public interest, so far as it is possible, though it be to the prejudice of a private one. In this same connection, see 16 C. J. S., Constitutional Law, § 188, page 556."

Statutes and municipal ordinances calculated to bet- ■ ter the health, safety and welfare of the people have long and universally been recognized to be within the police power. The following is section 3, Buildings, 9 Am. Jur. 199, 200:

"Regulations and restrictions upon the manner in which a property owner may use his property when necessary for the general welfare are properly a part of the police power of legislative bodies and, if reasonable, are valid in so far as they tend to prevent harm to the public and to promote the common good. Under the police power, the legislative authority may, within proper limitations, impose and enforce regulations governing buildings upon privately owned property without violating the constitutional property rights

of the owner. Necessary and reasonable expenses or loss of value, which will be sustained by an owner of property as a result of regulations made in the lawful exercise of the police power, do not invalidate such regulations and are *damnum absque injuria.*

"Building regulations may be and usually are enacted by municipal corporations pursuant to authority granted them to adopt and enforce police regulations. To be valid, however, a building regulation must be reasonable, and not arbitrary, and it must have a tendency to promote the public health, safety, morals or general welfare. The determination of whether such a regulation is reasonably necessary is in the first instance within the judgment and discretion of the legislative body, and unless it is clear that such regulation is unreasonable and arbitrary or has no real or substantial relation to the public, the courts will not hold it invalid. The amount of the outlay to which a property owner will be subjected in complying with the regulation may, in connection with all the facts, be evidence of its reasonableness. The size of the city is also a factor to be considered."

Section 14 of the same text, pp. 209, 210, 211, follows:

"Building regulations for the purpose of promoting a decent and sanitary mode of living in cities and other thickly populated districts have been very generally adopted. Legislation of this character is fully justified under the police power, although it must, of course, be reasonable. Under this power, ordinances which abolish or regulate the construction and location of privies within the corporate limits of a municipality have been sustained. Statutes and ordinances compelling owners of buildings to install water closets and to connect their premises with public sewers, when not plainly unreasonable or arbitrary, are also within the police power. An arbitrary exercise of this power may be restrained, but it must be palpably so to justify a court in interfering with so salutary a power and one so necessary to the public health. The fact that it will cost money to com-

ply with such a law is not a sufficient reason for declaring it invalid, where the expenditures required are reasonable and fair. Nor is it usually necessary that notice and an opportunity to be heard be given to a property owner before the passage of the law or before an order enforcing compliance therewith is made. Sanitary regulations are frequently directed specifically to tenement, lodging and boarding houses. The equal protection of the laws is not denied merely because a statute requiring individual water closets in place of other types of receptacles applies to tenement houses only, and then only when they are located in cities of a specified class. Statutes requiring that tenement houses be furnished by the owners with water, in sufficient quantities, are also justified under the police power with respect to both the public health and the public safety. However, police regulations as to tenements, and lodging and boarding houses which may not be excessive or unreasonable if applied to large cities may, if applied to the state at large, be so impossible or impracticable of compliance as to render them indefensible and a violation of constitutional guaranties."

*City of Columbia v. Shaw*, 131 S. C. 464, 127 S. E. 722, 723, concerned the requirement of an ordinance that property owners connect with city sewers at their expense. It was said by the court: "It is an incident of the ownership of property that the owner must bear a fair proportion of expense of government and contribute to the maintenance of the health and good order of the community. He is in no worse plight than other owners of property similarly situated." The order there enforced, now more than thirty years ago, follows: "You are hereby directed to install on your premises, Graham's alley, sanitary closets, kitchen sinks, slop hoppers and connect same with city sewer. Also demolish or dismantle surface closets. This work must be completed within 15 days from date."

The cited case also answers appellants' complaint that a property owner is afforded a hearing only after request. Section 5 of the ordinance, *supra*. Mrs.

Shaw contended that the Board of Health in that instance should have heard her before summons to answer charge of violation of the ordinance, and the ordinance did not expressly provide for such a hearing. The contention was held to be without merit because Mrs. Shaw did not ask for a hearing before the Board, which she could have. It was concluded, in the words of the court: "She has not been deprived of any legal right to be heard, and her property has not been taken without due process of law."

Another presently helpful decision which affected the City of Columbia is *McNulty v. Owens*, 188 S. C. 377, 199 S. E. 425, 431, which upheld a slum clearance project against constitutional attack similar in some respects to that of the instant appellants against the ordinance here. Substandard housing was there found to contribute to ill health and juvenile delinquency. The principal question, however, was whether the undertaking was in the exercise of a proper governmental function, a valid public purpose, which it was held to be, as follows: "From the record before the Court the conclusion is inescapable that bad housing conditions have an adverse effect on the health and morals of the City of Columbia, therefore, the elimination of these slum areas is a proper function of government, both city and state."

A leading case on the subject of the requirement of the alteration of existing buildings is *Adamec v. Post*, 273 N. Y. 250, 7 N. E. (2d) 120, 124, 109 A. L. R. 1110, where the court upheld the law against constitutional attack and said: "When a building used as a dwelling house is unfit for that use and a source of danger to the community, the Legislature in order to promote the general welfare may require its alteration or require that its use for a purpose which injures the public be discontinued; and, subject to reasonable limitation, the Legislature may determine what alterations should be required and what conditions may constitute a menace to the public welfare and call for remedy."

In the appended annotation, 109 A. L. R. 1117, it is said that it has been generally held that the State, in the valid

exercise of its police power (or the municipality, in the exercise of the police power granted to it by the State), may require reasonable changes in buildings previously erected, in order to comply with new requirements and standards for the protection of health and safety, despite the fact that such buildings, at the time of erection, complied with the regulations then in effect.

Police "power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property." Mr. Justice Miller, *in Re Slaughter-House cases,* 1872, 16 Wall. 36, 21 L. Ed. 394.

It is clear from the authorities that the courts will not interfere with the enforcement of such regulations unless they are determined to be unreasonable, which conclusion we cannot reach upon the facts of this case with respect to the definite requirements of the ordinance. "It was formerly held in this State that if a municipality was empowered to pass an ordinance, the courts could not inquire into its reasonableness. But this rule has been greatly modified by the later decisions and it now seems to be well settled that where the complaint asserts the impairment of constitutional rights, the reasonableness of the ordinance will be inquired into in determining such claim. (Citing cases.) It should be added that the power to declare an ordinance invalid because it is so unreasonable as to impair or destroy constitutional rights is one which will be exercised carefully and cautiously, as it is not the function of the courts to pass upon the wisdom or expediency of municipal ordinances of regulations." *De Treville v. Groover,* 219 S. C. 313, 65 S. E. (2d) 232, 240.

A case of contrary result, cited by appellants, is *Henderson v. City of Greenwood,* 172 S. C. 16, 172 S. E. 689, where the effect of the ordinance was to wholly deprive the

complaining landowner of any beneficial use of the property. And an ordinance was likewise held invalid in *Schloss Poster Adv. Co. v. City of Rock Hill*, 190 S. C. 92, 2 S. E. (2d) 392, because it contained no standard for the licensing of the erection of billboards. In the case in hand appellants can comply with the ordinance and continue in the use and enjoyment of their property, and there are standards, which are "A" to "G" quoted above, and to which we think the enforcement of the ordinance must be limited, as will be seen hereinafter in the disposition of appellants' sixth point.

The provision of the ordinance, quoted hereinabove ■ from section 5, that the legal rules of evidence shall not prevail in hearings before the Commission, is copied from the enabling act. Code section 36-503 (2). Appellants strenuously object to it, but even without the aid of statute it is held that an administrative or *quasi*-judicial body is not governed by the ordinary legal rules of evidence. *Jacoby v. South Carolina State Board of Naturopathic Examiners*, 219 S. C. 66, 64 S. E. (2d) 138.

However, as said in 42 Am. Jur. 652, Public Administrative Law, Sec. 218:

"Most authorities agree that there must be some evidence which is competent and legal, as tested by the usual rules for producing evidence in any legal proceeding, to sustain the findings. If founded only on hearsay or other improper evidence, the decision will not be sustained, even though the statute authorizing judicial review may provide that findings of fact by a board acting within its powers shall in the absence of fraud be conclusive, or that rules of evidence prevailing in courts of law or equity shall not be controlling in an administrative proceeding."

Our workmen's compensation case of *Next of Kin* ■ *of Cole v. Anderson Cotton Mills*, 191 S. C. 458, 4 S. E. (2d) 908, which involved the admission in evidence by the commission of hearsay evidence, conforms to the foregoing. The following is from the opinion by Chief

Justice Hughes in *Consolidated Edison Co. of New York v. National Labor Relations Board,* 305 U. S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126:

"The companies urge that the Board received 'remote hearsay' and 'mere rumor'. The statute provides that 'the rules of evidence prevailing in courts of law and equity shall not be controlling'. The obvious purpose of this and similar provisions is to free administrative boards from the compulsion of technical rules so that the mere admission of matter which would be deemed incompetent in judicial proceedings would not invalidate the administrative order. (Citing cases.) But this assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. Mere uncorroborated hearsay or rumor does not constitute substantial evidence."

■ Thus we conclude that appellants' first and major constitutional attack upon the ordinance is without merit. Authority need not be cited for the postulate that unconstitutionality is found only when it appears beyond a reasonable doubt.

■ Secondly, it is contended that the ordinance authorizes the taking and destruction of appellants' property for public use without just compensation being first made therefor. This has reference to section 17 of article 1 of the State Constitution. As indicated in authorities cited *supra,* detriment to private property which results from legitimate exercise of the police power does not constitute the taking of it for public use. "All property is held subject to reasonable regulation by the State. A prohibition simply upon the use of property in a manner injurious to the health, morals or safety of the community cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. * * * The power which the states have of prohibiting such use by individuals of their property as will be prejudicial to the health, morals, or safety of the public is not burdened with the condition that the state

must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. Although such regulations may sometimes occasion inconvenience to an individual, he is deemed to have compensation in participating in the general advantage." 12 Am. Jur. 371, 372, Constitutional Law, Sec. 696. "The power of government to regulate extends to almost limitless fields. * * * Burdens and expenses of various types may be imposed under the exercise of the police power without compensation and without in any way violating the constitutional guaranties as to due process of law." *Ibid.*, Sec. 684, p. 365.

The third point is that the ordinance authorizes ██ "confiscation" of appellants' property without trial by jury. There is no "confiscation" of appellants' property under the terms of the ordinance or a taking of it in the constitutional sense, as has been seen. Whether a dwelling is sub-standard under the terms of the ordinance is not required by the constitution, Art. 1, Section 25, to be determined by jury. That guaranty is applicable only to cases in which jury trial was required at the time of the adoption of the constitution. *State v. Gibbes,* 109 S. C. 135, 95 S. E. 346. "Neither the state nor the Federal Constitutions guarantee or preserve the right of trial by jury except in those cases where it existed when the Constitutions were adopted, and the constitutional guaranty does not apply to a statutory proceeding not in the nature of a suit at common law. Accordingly, the constitutional guaranty does not apply to special and summary proceedings created by statute subsequent to the adoption of the Constitution, where they are not in the nature of suits at common law and are dissimilar to such suits. Determination of facts in such proceedings may lawfully be left to administrative officers." 42 Am. Jur. 486, Public Administrative Law, Sec. 142. It has been noted that the criminal sanctions of the ordinance are

enforceable in the City Recorder's court, where a defendant is entitled to trial by jury.

The fourth contention is that the ordinance violates ■ section 10 of article 8 of the State Constitution, which imposes upon the General Assembly the duty to create Boards of Health. The point is not well taken. The ordinance is expressly cumulative to other existing applicable statutes and ordinances. The cited constitutional provision is: "It shall be the duty of the General Assembly to create Boards of Health wherever they may be necessary, giving to them power and authority to make such regulations as shall protect the health of the community and abate nuisances." The absence of conflict of it and the statute and ordinance under review is manifest; it is not a limitation upon legislative power.

The fifth ground is that the constitutional prohibi-■ tion against laws impairing the obligations of contracts, section 8 of article 1, is violated. The contention appears to be that in the supposed case of a mortgage upon a sub-standard dwelling, the obligation of it would be impaired. But none of the houses of either of the appellants is mortgaged so the question is not presented. However, it is without merit. 12 Am. Jur. 54, Constitutional Law, Sec. 421. Contract rights are subject to the police power.

The sixth point is that the statute and ordinance ■ contain an unconstitutional delegation of legislative authority. The recent case of *South Carolina State Highway Department v. Harbin,* S. C., 86 S. E. (2d) 466, sustains appellants with respect to the portions of section 9 of the ordinance which are italicized in the quotation of it hereinabove and those provisions must be stricken down as unconstitutional. They do not contain a sufficiently definite standard or yardstick, just as in the *Harbin case* it was held that the attempted delegation of authority to the Highway Department to suspend or revoke a driver's license for cause satisfactory to it was invalid.

However, with the offending provisions stricken the ordinance remains complete and enforceable in accord with the plain legislative intent of council. *Moseley v. Welch,* 209 S. C. 19, 39 S. E. (2d) 133. *Gaud v. Walker,* 214 S. C. 451, 53 S. E. (2d) 316. *Parker v. Bates,* 216 S. C. 52, 56 S. E. (2d) 723. Both the majority and minority opinions in the last cited case treat the subject of separability at length and are convincing of the correctness of the indicated result in this case, which we think needs no further discussion.

The seventh ground of attack is that the constitutional provisions against unreasonable searches and seizures are violated by the authorization of the Rehabilitation Director to enter premises for the purpose of making examinations, which has been quoted. The Fourth Amendment of the Federal Constitution and section 16 of Article 1 of our Constitution are the same in this guaranty. Like the fifth ground, *supra,* this question is not presented in this litigation because there has been no entrance of any premises by the Director over the objection of the occupant. "The right to immunity from unreasonable searches and seizures is personal, and can be asserted only by him whose rights are violated." 47 Am. Jur. 508, Searches and Seizures, Sec. 11. It may be added that there is doubt whether such an entrance would come within the constitutional guaranties against unreasonable searches. See the divided opinions in *District of Columbia v. Little,* 85 U. S. App. D. C. 242, 178 F. (2d) 13, 13 A. L. R. (2d) 954, affirmed on another ground, by divided opinions again, 339 U. S. 1, 70 S. Ct. 468, 94 L. Ed. 599.

Point eight is that the trial court erred in admitting in evidence a United States census report of housing conditions in the City of Columbia in the year of 1950, and also charts prepared therefrom by a witness at the trial.

The witness was the Director of the Department of City Planning and Executive Secretary to the City Planning Commission and the census report was the 1950 United States Housing Block Statistics for Columbia. When

offered in evidence by respondents it was objected to on the ground that it was necessary, quoting, "to have it certified and verified by the head of the Department." Respondents' counsel then asked the court to take judicial notice of the document. The court overruled the objection but it is not clear from the record whether it was intended that judicial notice be taken of its contents. This is a good illustration of the frequent lack of discrimination in such cases which is noted by Professor Wigmore. The following is from volume 5 of his work on evidence, 3d Ed., p. 685, Sec. 1671:

"The census is an inquisition of population, manufacturers, agriculture, wealth, and many other classes of sociological data, and is made under an express legislative warrant and authority; it is therefore admissible under the general principle already considered. * * * Distinguish the process of judicially noticing a fact, such as the population of a town; thus to dispense with all evidence is a different thing from receiving the census in evidence." *Ibid,* Sec. 2577, Judicial Notice: "The acts of the census officials, in returning the data of population, are commonly said to be judicially noticed; though this is almost always a misnomer for their admissibility in evidence." (Ante 1671.)

Our courts take judicial notice of population figures, which are derived from the Federal Census. *Bland v. City Council of Sumter,* 203 S. C. 392, 27 S. E. (2d) 498. *Bell v. South Carolina State Highway Dept.,* 204 S. C. 462, 30 S. E. (2d) 65. "Thus, the courts will notice the taking of an official census, the approximate time necessary therefor, and the population as thereby determined whether of nation, state, county, or city." 20 Am. Jur. 112, 113, Evidence, Sec. 98. In *Meier v. Meier,* 208 S. C. 520, 38 S. E. (2d) 762, we took judicial notice of an order of the Alien Property Custodian published in the Federal Register.

Appellants object that the information was old, having been compiled in 1950, but it is inferable that it was the latest available and there was no substantial evidence of material change in conditions.

The report contained a definition of dilapidation, as follows: "A dwelling unit is dilapidated when it is run down or neglected or is of inadequate original construction so that it does not provide adequate shelter or protection against the elements or endangers the safety of the occupants." It showed total dwelling units of about 23,000 in the city of which about 7,500 or 33% were dilapidated or had no private bath. The witness had prepared maps and charts showing the location of the sub-standard dwellings reported in the census, as well as other information, which indicated that poor housing was generally rental housing and predominantly of non-white occupancy. It was further shown that there was a relation between poor housing and juvenile court cases, arrests for all causes and Public Welfare Aid recipients. While the maps and charts were prepared by the witness, those which contained information relating to juvenile court cases and showing the incidence of reported cases of tuberculosis were upon data gathered by the Department of Sociology of the University of South Carolina. To that extent they were objectionable at the time as hearsay to prove the facts which they purported to prove but they were admissible to show the information upon which City Council proceeded. The hearsay feature was cured by the testimony of a later witness. All of this information was before Council and was considered by the Citizens' Committee whose recommendations were largely adopted by Council in the enactment of the ordinance, after public hearings.

Following the foregoing witness an instructor of sociology at the University testified that he located the residences of the juvenile court cases and the tuberculosis cases, which data was included in the maps of them which were admitted in evidence. This effectively met the former objection of hearsay. There is a further consideration which makes unimportant the admission of the foregoing documentary evidence. It was offered to substantiate the findings of Council with respect to the existence of housing evils. There is a presumption of the soundness of such

findings, which will later be discussed in more detail, and which appellants clearly failed to rebut in the evidence offered by them.

The ninth ground is that it was error to admit in evidence copy of a sub-standard housing ordinance which was prepared by the Real Estate Board and submitted to City Council which did not adopt it. This formerly proposed ordinance was admitted as a part of the City's case to show Council's deliberation and the extent of the information upon which it proceeded before adoption of the ordinance under attack. It was not irrelevant, which was the ground of objection.

The tenth ground of attack is upon several factual findings and legal conclusions of the trial court, the first and principal one of which is that upholding the findings of the Legislature upon passage of the enabling act and by City Council upon enactment of the ordinance that sub-standard housing evils exist in the City of Columbia which are related to disease and crime; and that the standards and remedies provided by the ordinance are reasonable and proper; that the right of appeal to the courts exists from any arbitrary or unreasonable actions under the ordinance; and that owners would be compensated for their expenditures in compliance with the ordinance by increased rentals from their property. The last stated conclusion was unnecessary to uphold the ordinance. Property owners may suffer financially for the common good in such cases. That is a common result of exercise of the police power. If reasonable it is proper, which we think is the case here.

Section 5 of the ordinance, which is summarized hereinabove, provides for hearing before the Commission of an aggrieved owner after notice, which authorizes appearance in person or otherwise and introduction of evidence. Right of appeal therefrom by the owner is vouchsafed to him by the terms of section 36-507 of the Code which empowers him to petition the circuit court for an injunction, upon which hearing shall be had and the court shall determine the

issues and, quoting, "enter such final order or decree as law and justice may require." There follows a provision of the statute, to which appellants take exception: "In all such proceedings the findings of the public officer (here Commission—interpolated) as to facts, if supported by evidence, shall be conclusive."

Statutes may and often do provide that the factual findings of *quasi*-judicial and administrative agencies shall be affirmed upon appeal to the court, if the findings are supported by evidence. Such is the general rule without the aid of statute. 42 Am. Jur. 644, Public Administrative Law, Sec. 217. *Lee v. Berry,* 219 S. C. 346, 65 S. E. (2d) 257. Innumerable examples may be found in our decisions of appeals from awards of workmen's compensation by the Industrial Commission. The applicable statute there provides that the conclusions of the commission "shall be conclusive and binding as to all questions of fact." Sec. 72-356 of the Code. There is therefore nothing novel or objectionable in the quoted provision which governs appeals to the courts.

Upon careful consideration of the evidence we find no error in the conclusion of the court that the findings of the Legislature and City Council, with respect to the City of Columbia, that sub-standard housing evils exist, were well-grounded in fact. Indeed, appellants admit that their houses, to which they referred in their testimony, contain no inside plumbing, which is a main requirement of the ordinance and which, within common knowledge, is conducive to improved health conditions, both of the occupants and the community.

Legislative findings of fact, while not binding upon the court, will not be overturned except by convincing evidence to the contrary. There is a strong presumption in favor of the validity of them. "There is a valuable, exhaustive annotation upon the subject of legislative findings in 82 L. Ed. 1244, following report of the case of *United States v. Carolene Products Co.,* 304 U. S. 144, 58 S. Ct. 778, 82 L. Ed. 1234. It is there pointed out that

there are many instances where the constitutionality of an act depends upon pertinent facts and in such a case it is presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment. However, by the better rule, such implied or express finding is subject to judicial review, and the court may consider extrinsic evidence for this purpose, although the statute will not be held unconstitutional unless such (legislative) finding is clearly erroneous. 11 Am. Jur. 820, 822; *Weaver v. Palmer Bros. Co.,* 1926, 270 U. S. 402, 46 S. Ct. 320, 70 L. Ed. 654; *Borden's Farm Products Co. v. Baldwin,* 1934, 293 U. S. 194, 55 S. Ct. 187, 79 L. Ed. 281; see also Cooley's Constitutional Limitations, 8th Ed., Vol. 1, p. 379, 380." *State ex rel. Edwards v. Query,* 207 S. C. 500, 37 S. E. (2d) 241, 245.

The first named appellant testified to the financial burden he would suffer from improvement of at least seventy-five of his hundred or more rental houses, which would be affected by the ordinance and his estimate was that the cost would be from $400.00 to $600.00 per house. He owes nothing on his houses and has investments in mortgages on other dwellings which are not sub-standard. He admitted that he is financially able to make the improvements on his sub-standard rental houses but would not do so unless he, quoting, "can get revenue for it." The wife of the other appellant testified that she and her husband, who owns two sub-standard houses, are without means to improve them as required by the ordinance, but one is rented for $18.00 per month and there is no mortgage indebtedness on either, from which it is inferable that they could borrow on the security of the houses and thereby meet the requirements of the ordinance, and liquidate the indebtedness from the rental income.

Appellants introduced the testimony of several real estate agents, the gist of which was that low rental houses which do not have the facilities required by the ordinance are generally occupied, whereas vacancies exist in houses which have the facilities and require a higher rental. One

of these witnesses estimated the rental yield of sub-standard dwellings at 12% to 14% of the investment; and 10% on standard dwellings.

Another witness for appellants was the Director of Disease Control for the State Board of Health but such testimony as he gave which was favorable to appellants' contention of unreasonableness of the ordinance was, we think, nullified by the following cross examination of him:

"Q. Now, Doctor, let me see if I can fairly state what I understand to be your testimony, that you believe that running water inside a house, with toilet facilities and bath, adequate screens, glass panes or windows and fireplaces, some form of heating, ventilation and electric wiring, that those things are desirable in the interest of the health of the community? A. Well, I think they are, yes. They are nice to have for convenience.

"Q. The overall effect is to improve the health of the people. Would you say that? A. Yes, sir."

Moreover, the testimony of appellants' sole medical witness was more than offset by that of two Columbia physicians who testified in support of the ordinance. They are general practitioners of long experience in the sub-standard homes of their patients, which they described in detail and gave their opinions, in substance, that the present conditions are conducive to disease and suffering and will be alleviated by the effects of the ordinance. Both thought that the occupants of sub-standard houses would be able to pay the rentals necessary to give the landlords a reasonable return upon their increased investments; and one expressed the opinion that eventually there would be a saving to the public in the present expenditures for charity hospitalization because there would be less need for it.

The final assignment of error is that the court mentioned in the decree, and must have been influenced by, its knowledge that similar ordinances exist in other cities and no decisions holding such invalid had been cited, from which the

court concluded that such ordinances are elsewhere deemed valid or not considered injurious to property owners. In evidence without objection was the fact that enforcement officers from other cities without the State visited Columbia to advise the Citizens' Committee in the drafting of the ordinance, from which the deduction of the court was reasonable; but, if error, was harmless and it has been given no weight in our consideration of the legal questions which have been presented.

We conclude that the ordinance, as herein restricted, is not an arbitrary or unreasonable exercise of the police power; and that it is not subject to the constitutional objections which have been earnestly and ably argued in behalf of appellants; nor was there prejudicial error in the trial in the lower court. In a recent *Virginia case, Weber City San. Comm. v. Craft*, 196 Va. 1140, 87 S. E. (2d) 153, 160, the court said: "The exercise of the police power cannot be circumscribed within narrow limits nor can it be confined to precedents resting upon conditions of the past. As civilization changes and advancements are made the police power must of necessity develop and expand to meet such conditions." See again, *City of Columbia v. Shaw, supra,* 1925, 131 S. C. 464, 127 S. E. 722.

The decree is therefore reversed only to the extent that it upheld the general provisions of Section 9 of the ordinance, which are italicized in the foregoing quotation of the section; as so modified the decree is affirmed; and the ordinance, with the elimination of the italicized provisions, is adjudged to be valid.

Modified.

TAYLOR, J., and J. WOODROW LEWIS, A. A. J., concur.

OXNER and LEGGE, JJ., dissent.

LEGGE, Justice (dissenting).

Accepting the principle that the exercise of the police power must vary with changing social conditions, and fully

aware that in recent years the steady trend has been toward more and more paternalism in government, I am nevertheless unable to escape the conviction that the ordinance here in question, even as trimmed by the foregoing opinion, goes beyond the proper sphere of governmental power.

The ordinance applies to owner-occupied, as well as to rented, dwellings, and to old buildings as well as to those newly erected. The cost of alterations necessitated by the ordinance is a factor to be considered in determining whether it is reasonable. *Adamec v. Post,* 273 N. Y. 250, 7 N. E. (2d) 120, 122, 109 A. L. R. 1110. As the court there said: "A small additional cost in erecting a new building in conformity with a regulation calculated to 'secure the general comfort and health of the public' even in a matter, perhaps, not of vital importance, may be reasonably justified by the result to be attained, while the cost of alteration of an old building to conform to such a regulation may be too great to be reasonably required for a doubtful or slight public benefit." To this we may add that while the owner of an old dwelling is not immune from the exercise of the police power merely because such dwelling is his home, consideration of the cost of conforming to the new standards required by the ordinance would appear especially appropriate in such a case.

So long as the use by the owner of his property is not detrimental to health, safety or morals, he has a freedom of choice as to living conditions, including personal hygiene. He is not required to live, or to compel his tenants to live, in accordance with so-called modern standards or those regarded as necessary by social planners. It may be conceded that in a municipality as large as Columbia, some of the facilities required by the ordinance, such as inside toilets, proper electrical wiring, etc., are essential to public health and safety. But it does not follow, nor can it be reasonably inferred from the evidence, that considerations of public health, safety or morals require all of the facilities set out in subdivisions (a) through (g) of Section 9 of the ordi-

nance. An owner of limited means may reasonably conclude that he cannot afford all four of the plumbing connections required by subdivision (a). He may feel that screens are unnecessary on inside doors. It would be unreasonable to allow an administrative officer to condemn his house as unfit for habitation because several windowpanes are broken. What constitutes "reasonable comfort" in heating facilities is a matter for him to decide. Privacy within the home is a matter personal to the occupants.

The police power, however kaleidoscopic, has its limitations, and where its exercise requires that private rights yield to the public welfare, it should be limited to the necessities of the public safety, health, peace or morals, and should not be concerned with individual comforts and conveniences.

OXNER, J., concurs.