Herbert, J.
In the case of State, ex rel. Smilack, v. Bushong, Supt., 93 Ohio App., 201, 112 N. E. (2d), 675. (affirmed by this court in 159 Ohio St., 259, 111 N. E. [2d], 918), Guernsey, J., stated at the outset of the opinion:
“The cause is incorrectly captioned as it is not brought upon the relation of the state of Ohio and should be captioned ‘In the Matter of the Petition for a Writ of Habeas Corpus by Oscar Smilack.’ ”
Although not pertinent to the issue hero, we certainly approve of the principle embodied in the foregoing quoted statement. The incorrectness of the caption in the Smilack case is further compounded here in that Taylor’s attorney, Eaton, is designated as relator. However, reference hereinafter to the relator will be intended to mean Taylor and not Eaton.
Condensing the assignments of error, relator contends that Section 806-30 of the Code of General Ordinances of the City of Dayton, being a part of ordinance No. 18099, is violative of the Fourth Amendment of the Constitution of the United States and of Section 14 of Article I of the Ohio Constitution. The question of whether this ordinance — or, for that matter, any statute of the state of Ohio — is violative of the Fourth Amendment of the Constitution of the United States is settled and disposed of in the first paragraph of the syllabus in the case of State v. Lindway, 131 Ohio St., 166, 2 N. E. (2d), 490, which states:
“1. The Fourth and Fifth Amendments to the Constitution of the United States, prohibiting unreasonable searches and seizures and compulsory self-incrimination, are. directed exclusively against the activities of the federal government and have no application to the various states and their agencies.”
Section 14 of Article I of the Ohio Constitution is almost the same verbatim as the federal constitutional provision and states:
“The right of the people to be secure in their persons, . houses, papers,"and possessions;- against unreasonable searches *126 and seizures shall not be violated; and no warrant shall issue, but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized.”
Section 806-30, which the relator is charged with violating, provides in part:
“The Housing Inspector is hereby authorized and directed to make inspections to determine the condition of dwellings, dwelling units, rooming houses, rooming units and premises located within the city of Dayton in order that he may perform his duty of safeguarding the health and safety of the occupants of dwellings and of the general public. For the purpose of making such inspections and upon showing appropriate identification the Housing Inspector is hereby authorized to enter, examine and survey at any reasonable hour all dwellings, dwelling units, rooming houses, rooming units, and premises. The owner or occupant of every dwelling, dwelling unit, rooming house, and rooming unit or the person in charge thereof, shall give the Housing Inspector' free access to such dwelling, dwelling unit, rooming house or rooming unit and its premises at any reasonable hour for the purpose of such inspection, examination and survey. ’ ’
Section 806-83 fixes a penalty of a fine of not more than 200 dollars or imprisonment for not more than 30 days, or both, for the violation of any provision of ordinance No. 18099. This ordinance, of which these sections are a part, was passed in November 1954. The caption states:
“An ordinance establishing minimum standards governing utilities, facilities and other physical things and conditions essential to make dwellings safe, sanitary and fit for human habitation; establishing minimum standards governing the conditions and maintenance of dwellings * * *; fixing certain responsibilities and duties of owners, operators and occupants of dwellings * * *; establishing a Bureau of Housing Inspection and Slum Prevention in the Division of Building Inspection and establishing a Housing Appeals Board; fixing the powers and duties of the Housing Inspector for administration and enforcement of the ordinance * * *; authorizing the inspection of dwellings; the Rehabilitation- of dwellings and the vacation and *127 removal of dwellings unfit for human habitation; and providing penalties.”
The preamble states:
“Whereas, in the city of Dayton there are dwellings and rooming houses which are so dilapidated, unsafe, dangerous, unhygienic or insanitary as to constitute a hazard and menace to the health, safety, morals and welfare of the residents of such dwellings and rooming houses as well as of the people of the city of Dayton * * *.”
By the ordinance, Sections 806-27 to 806-83, both inclusive, were added to the Code of General Ordinances of the City of Dayton. In Section 806-28 the Bureau of Housing Inspection and Slum Prevention in the Division of Building Inspection was created under the supervision of a Chief Housing Inspector.
Section 806-31 provides:
“Whenever the Housing Inspector determines that there has been a violation of any provision of this ordinance he shall give notice of such violation to the person or persons responsible therefor and order compliance with the ordinance, as hereinafter provided. Such notice and order shall:
“ (a) Be put in writing on an appropriate form;
“(b) Include a list of violations, refer to the section or sections of the ordinance violated and order remedial action which, if taken, will effect compliance with the provisions of this ordinance;
“(c) Specify a reasonable time for performance;
“(d) Advise the owner, operator or occupant of the procedure for appeal;
“(e) Be served upon the owner, occupant or agent in person provided, however, that such notice and order, shall be deemed to be properly served upon such owner, occupant, or agent if a copy thereof is sent by registered mail to his last known address and a copy is posted in a conspicuous place in or on the dwelling affected.”
Section 806-32 provides for an appeal from any notice and order given under the provisions of the preceding section to the Housing Appeals Board, created under Section 806-33, by filing a written petition with such board within ten days after receipt of the notice and order appealed from, and for a hearing there-
*128 Section 806-32 further provides:
“(b) After a hearing, the Housing Appeals Board shall sustain, modify or withdraw the notice and order by majority vote, depending upon its findings as to whether the provisions of this ordinance have been complied with, and the petitioner and the Housing Inspector shall be notified in writing of such findings. * *
“(d) The proceedings at such hearings, including the findings and decision of the Housing Appeals Board and reasons therefor shall be summarized and reduced to writing and entered as a matter of public record in the office of the Housing Inspector. Such record shall also include a copy of every notice and order issued in connection with the matter.”
Because of the importance of the constitutional question here and its apparent novelty so far as Ohio is concerned, these pertinent provisions are set forth at length in order to present a complete picture of the steps provided for in housing inspections under the ordinance. Subsequent provisions deal in detail with requirements as to sanitary units, electrical outlets and fixtures, minimum heating facilities, floor space of dwelling units, and other related matters not involved here.
With respect to Section 806-30, it was testified by Taylor in the Common Pleas Court that inspectors came to his home on three occasions, each time at a reasonable hour, and that he' denied them admission on each occasion. The relator has been a plumber for many years and showed in his testimony that he was familiar with plumbing and electrical inspections. Illustrative of his testimony is the following excerpt:
“Q. Did they have a search warrant? A. No, sir, they didn’t. * * * Then the second time the fellow came out he entered the same way, came up like that, and then he called me on the telephone, wanted to know if he could come to my house and inspect the inside of the house. I said, 4 Who are you, anyway?’ He said, ‘1 am the building inspector,’ or the housing inspector, and 1 said, ‘Well, 1 don’t see what right that you got coming into my house. Until you show me in writing, or some kind of facts, that you got a right to come into my house *129 and inspect the house, I will not let you in.’ And I said, ‘Furthermore, I know the building inspectors and I know the plumbing inspectors, the electric inspectors and all the rest of them.’ I said ‘I work at this business and I come in contact with them off and on, and as far as you coming in,’ I said ‘You can’t come in.’ * * *
<<# # •
“* * * A. The last timb they was there a colored fellow and a white fellow, they came up to the door, and I walked out there, and he said, ‘Mr. Taylor?’ I said, ‘Yes, sir.’ He showed, like a picture, he had a picture on a piece of paper, he held it in his hand and stuck it back in his pocket. He said the housing inspector wanted to inspect ‘your house.’ I said, ‘What do you have in there that you want to inspect?’ I said, ‘I have nothing in my house for inspection.’ He said, ‘We have a right to come in your house, go through your house, inspect the whole inside of your house.’ I said, ‘You have nothing wrote down on paper. You don’t have a thing to show me you are going to come in there to inspect anything, and as far as that goes you aren’t coming in unless you have a search warrant to get in.’
“Q. Did he have a search warrant? A. No, sir.
“Q. Did he ever come back with a search warrant? A. No, sir. And, furthermore, he said, ‘If you ain’t going to let us in, we are entitled to get in, and if you don’t let us in’ he said, ‘I am going to leave it up to the Prosecutor. ’ 1 turned around and said, ‘I don’t care what you do. You aren’t coming in.’ He walked over and got in his car and that was the end of it.”
Section 3 of Article XVIII of the Ohio Constitution authorizes municipalities “to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.” Under the authority granted by Sections 715.26 and 715.29, Revised Code, a municipal corporation may “provide for the inspection of buildings or other structures and for the removal and repair of insecured buildings,” and “regulate by ordinance the use, control, repair, and maintenance of buildings used for human occupancy or habitation,” and “compel the owners of such buildings to alter, reconstruct, or modify them * * * for the purpose of insuring the *130 healthful, safe, and sanitary environment of the occupants thereof,” and “prohibit the use and occupancy of such buildings until such rules, regulations, and provisions have been complied with.”
It is not contended that the ordinance mndor consideration here is in conflict with any statutory enactment. The issue raised is that the city of Dayton, in the exercise of this police , power, has violated the constitutional provision against unreasonable search and seizure.
Many decisions and able opinions have been written during the last two centuries covering this general subject of search and seizure, even going back into early English cases, but there is a paucity of authorities covering the precise point raised here. It seems to have been taken for granted throughout the United States that inspections of buildings, including dwellings, under reasonable regulations did not constitute “unreasonable search and seizure” in the constitutional sense, until the ease of District of Columbia v. Little, 178 F. (2d), 13, 13 A. L. R. (2d), 954, was decided in 1949 by the United States Court of Appeals for the District of Columbia. In that case the court, by a two to one decision, held that an inspector of the Health Department of the District of Columbia was not entitled to enter the home of Little to make an inspection over her protest and without a warrant. In the opinion, Prettyman, J., set forth the facts and pertinent regulation of the District. The regulation read in part:
“(2) It shall be the duty of every person occupying any premises * '* * to keep such premises or part, # * * clean and wholesome. If upon inspection by the Health Officer or an inspector of the Health Department, it be determined that any such part thereof * * * is not in such condition as herein required, the occupant * * * of such premises or part, or the owner thereof * * * shall be notified and required to place same in a clean and wholesome condition; and in case any person shall fail or neglect to place said premises or part in such condition within the time allowed by said notice, he shall be liable to the penalties hereinafter provided.
*131 “ (10) That the Health Officer shall examine or cause to be examined any building supposed or reported to be in an unsanitary condition, and make a record of such examination * * * < < # * #
“(12) That any person violating, or aiding or abetting in violating, any of the provisions of these regulations, or interfering with or preventing any inspection authorized thereby, shall be deemed guilty of a misdemeanor, and shall, upon conviction * * V’
The looseness and vagueness of the District of Columbia regulation should be noted as compared with the provisions of the Dayton ordinance quoted herein.
With all due respect for the majority opinion in the Little case, this court is persuaded more by the reasoning set forth in the dissenting opinion by Hoitzoff, J. When that case was appealed to the Supreme Court of the United States, Mr. Justice Black rendered the opinion of the court in 339 U. S., 1, 94 L. Ed., 599, 70 S. Ct., 468. The opinion states (at page 3):
“Neither the facts of this case, nor the District law on which the prosecution rests, provide a basis for a sweeping determination of the Fourth Amendment’s application to all these varied types of investigations, inspections and searches. Yet a decision of the constitutional requirement for a search in this particular case might have far-reaching and unexpected implications as tó closely related questions' not now before us. This is therefore an appropriate case in which to apply our sound general policy against deciding constitutional questions if the record permits final disposition of a cause on noneonstitutional grounds. See Rescue Army v. Municipal Court, 331 U. S., 549, 568-575, and cases there cited. Applying this policy, we find it unnecessary to decide whether the Fourth Amendment required a search warrant here. For even if the Health Officer had a lawful right to inspect the premises without a warrant, we are persuaded that respondent’s statements to the officer were not an ‘interference’ that made her guilty of a misdemean- or under the controlling District law.”
Mr. Justice Burton, with whom Mr. Justice Reed concurred, wrote a cogent dissenting opinion in which he stated:
*132 “In my opinion, also, the duties which the inspector was seeking to perform, under the authority of the District, were of-such a reasonable, general, routine, accepted and important character, in the protection of the public health and safety, that they were being performed lawfully without such a search warrant as is required bv the Fourth Amendment to protect the right of the people to be secure in their persons, bouses, papers, and effects against unreasonable searches and seizures.”
We do not have, therefore, a decision of the United States Supreme Court as to whether in federal jurisdictions a housing inspection may lawfully be made without a search warrant, if such is demanded.
The topic of municipal housing codes has recently been considered in several law review articles. The following is from 69 Harvard Law Review (1956), 1115:
“* * * Traditionally, cities have regulated area use patterns through zoning ordinances, have set standards for new construction and installations in building, plumbing, and electrical codes, and have required safety features in buildings used by the public. However, since World War II at least 50 cities, generally under the authority of city charters or state enabling legislation, have adopted housing codes designed for comprehensive and effective regulation of occupancy and facilities in existing housing. The enactment of new housing codes has been encouraged by provisions in Title III of the federal Housing Act of 1954, under which federal aid for local slum clearance projects is conditioned on the existence in the locality of ‘a workable program’ for the prevention and elimination of slums. *• # *) >
(Page 1125): “The power of the inspector to examine private homes for possible violations which may result in imposition of criminal penalties has raised the question whether he may demand entry without presentation of a court order. Although some codes require the inspector to obtain a court order if he is denied access (Footnote — see e. g. Denver, Colorado Housing Code Ordinance No. 27, Section 8-1944.), many codes apparently require occupants to admit inspectors without a warrant. However, in District of Columbia v. Little (178 F. [2d], 13 [D. C. *133 Cir. 1949], affirmed on other grounds, 339 U. S., 1 [1950]), the Fourth Amendment was held to require that an inspector procure a warrant when refused entry, and this result, although making occasional inconveniences for inspecting teams, seems justifiable, since the protection of community health would not seem to necessitate a greater infringement of individual privacy than does protection against crime. As it is unlikely that the typical occupant will exercise his constitutional right to refuse entry and thereby risk alienating the inspecting officer, the Little case probably does not in practice present a major obstacle to enforcement of housing codes.”
This seems to be the only article extant which expresses that view.
Following the Little case, supra, the Supreme Court of South Carolina had before it the constitutionality of a municipal ordinance directed at the improvement of housing. In the case of Richards v. City of Columbia, 227 S. C., 538, 88 S. E. (2d), 683, the court, in a three to two decision, upheld the constitutionality of the ordinance (with the exception of certain provisions not pertinent here), although, with respect to the question of entry upon premises, the majority opinion states (page 556):
“* * *this question is not presented in this litigation because there has been no entrance of any premises by the director over the objection of the occupant. * * * It may be added that there is doubt whether such an entrance would come within the constitutional guaranties against unreasonable searches.”
The court then referred to the divided opinions in the United States Court of Appeals and in the Supreme Court in the Little case, supra.
Although it may be argued that that decision is obiter dictum with respect to this particular point, at least the court expressed its view and held valid the provision of the ordinance of the city of Columbia relating to inspections.
In Givner v. State, 210 Md., 484, 124 A. (2d), 764, the Court of Appeals of Maryland, in a decision rendered in July 1956, held that municipal ordinances, authorizing health, fire and building inspectors to enter upon premises during daylight hours for the purpose of inspecting such premises to determine *134 compliance with code provisions and fixing a penalty as to the owner or occupier of premises who refused to allow such inspections, were not unreasonable or unconstitutional as an authorization of an illegal search of the premises.
Those three cases, Little, Richards and Givner, seem to be the only reported cases in which the issue of inspections without search warrants was considered. The decision in the Little case, of course, lacks Supreme Court affirmation on the constitutional question, whereas the decision in the Richards case may perhaps only be considered persuasive on the question of entry without a warrant for inspection. The Givner case, however, is squarely in point.
An article in 25 George Washington Law Review (October 1956), 1, discusses that case and is helpful in its discussion of housing codes and related problems generally. Because it is so timely and appropriate to the problem here, excerpts are quoted from it as follows:
(Page 1): “Of all the complex and stubborn problems confronting the cities of our nation, that of urban blight is the most baffling and at the same time the most insidious. * * *”
(Page 3): “A comprehensive program of urban renewal offers a solution for the menace of urban blight. This was the conclusion, concurred in by the President and the Congress, of the President’s Advisory Committee on Government Housing Policies and Programs. Urban renewal encompasses rehabilitation and conservation of areas worth saving as well as clearance and redevelopment of areas too deteriorated to be salvable. The term ‘urban renewal’ was incorporated in the federal law (and later in state statutes) with the enactment of the Housing Act of 1954 which authorized for the first time federal aid for urban renewal projects of local communities.”
(Page 4): “ An urban renewal program, to be effective, must be undergirded by an effective program of enforcement of adequate police power measures relating to housing, building, zoning and community planning, and must operate in an atmosphere of public understanding and affirmative support of the citizenry. * * *”
(Page 10): “In general, a housing code establishes ipinimum requirements respecting the condition, the maintenance and *135 the occupancy of dwellings and the condition and maintenance of utilities and facilities in dwellings to the extent deemed necessary to achieve safety, health and general welfare objectives. Housing codes prescribe regulatory measures for the maintenance, occupancy and supplied facilities of structures and are concerned primarily with health, safety and sanitation requirements of buildings after they have been constructed. * *
(Page 16): “The police power is not exerted solely to protect the public health, the public safety or the public morals; it is not confined only to the suppression of the offensive, the insanitary or the disorderly. It encompasses the authority to cope with prevailing conditions for the purpose of serving the public welfare. (Footnote—Bacon v. Walker, 204 U. S., 311, 318 [1907]. In Adler v. Deegan, 251 N. Y., 467, 116 N. E., 705, 711 [1929], Justice Cardozo said of the New York Multiple Dwelling Act enacted in 1929, ‘The end to be achieved is more than the avoidance of pestilence or contagion. The end to be achieved is the quality of men and women. ... If the moral and physical fibre of its manhood and its womanhood is not a state concern, the question is, what is?’ * * * ) ”
(Page 29): “An opinion rendered in July 1956 by the Maryland Court of Appeals in the case of Givner v. Maryland contains a timely discussion of the legal aspects of the right of entry under certain Baltimore city codes. In that case, in conformity with the Baltimore city plan, inspectors representing the Commissioner of Health, the Buildings Inspection Engineer, and the Chief Engineer of the Fire Department, accompanied by an electrical inspector and a uniformed policeman, visited the premises of the appellant and asked permission to enter to make an inspection of the premises under the Baltimore city codes. The appellant refused the right of entry to the city’s inspection team and thereafter in criminal court he was found guilty of violating three code provisions relating to inspection of buildings and was given a suspended sentence of $50 fine and costs.
“The appellant appealed, attacking the ordinances upon the ground that they authorized unlawful searches. In affirming the judgment, the Court of Appeals determined that the *136 inspections involved are not unlawful and do not involve any violation of the Fourteenth Amendment. The court asserted that prohibitions against unreasonable searches and seizures do not bar reasonable searches and seizures, citing United States v. Rabinowitz [339 U. S., 56, 94 L. Ed., 653, 70 S. Ct., 430]. The proposed inspections, the court stated, were reasonable, pointing out they were primarily for protective, not punitive, purposes.”
(Page 31): “Although some housing codes require the inspector to obtain a court order if he is denied access, many codes apparently require occupants to admit inspectors without a warrant. Where the inspections are to be made at reasonable hours under circumstances clearly showing that the inspections are not to be used to cover a search for violations of criminal law, it would appear that their authorization without a search warrant will not be in contravention of either the Fourteenth Amendment or state constitutional provisions comparable to the Fourth Amendment. The issue is that of personal privacy as against the protection of the public health and safety.”
The last sentence quoted above restates in another way the problem which confronts this court.
If the relator had permitted the Housing Inspector to enter, examine and survey at a reasonable hour as requested, it does not even follow that Section 806-31 would have been invoked. Had the inspection disclosed compliance with the ordinance, no notice of violation would have been given. Had a notice of violation been given, the relator would have had available the provisions of Section 806-32 for an appeal to the Housing Appeals Board and a hearing before it. In the event of a final notice of violation and order, we must look further with respect to the powers and duties of the Housing Inspector.
Section 806-34 provides:
“Where a notice of violation and order to comply has been served pursuant to Section 806-31 C. G. O. and, upon reinspection at the end of the time specified for compliance and if no petition for a bearing has been filed, it is found that the violation or violations have not been remedied, the Housing Inspector may order the dwelling, or parts thereof affected by *137 the continued violations, vacated in accordance with the following procedure:
“(a) Dwellings shall be vacated within a reasonable time not to exceed 60 days.
“(b) Vacated dwellings shall have all outer doors firmly locked and basement, cellar and first story windows barred or boarded to prevent entry.
“(c) Vacated dwellings shall not again be used for human habitation until written approval is secured from the Housing Inspector.
“(d) If a dwelling or part thereof is not vacated within the time specified in such vacation order the Housing Inspector shall seek a court order in a court of competent jurisdiction for the vacation of such dwelling or part thereof. ’ ’
Although this section is not involved here, it should be noted that after a reinspection and order to vacate as provided therein the Housing Inspector must then obtain a court order for the vacation of the dwelling involved if the owner or occupant does not comply. Likewise, it is also apparent that prosecution under Section 806-83 for the violation of a final order issued under Section 806-31 et seq. would have to be based on evidence obtained on the reinspection or at least at some time subsequent to the original inspection contemplated in Section 806-30. Whether a prosecution for failure to comply with such a final order would be valid if based on evidence obtained on a reinspection without a search warrant over the objection of the owner is not before us in this case. However, State v. Lindway, supra. appears to be dispositive of that question also.
This issue simply boils down to the question of whether the first inspection authorized under Section 806-30 constitutes unreasonable search and seizure. As to the “seizure” portion of the phrase, the question answers itself, since no seizure is contemplated. As to “search,” if we are to follow the rule stated by Prettyman, J., in the Little case, the writer can conceive of no circumstances under which a reasonable search could be made, or, to state it another way, any search without a search warrant would be unreasonable. We are not ready to say that the framers of the Constitution used the word, “unreasonable,” for no purpose whatsoever.
*138 An examination of the pertinent statutes relating to search warrants, Sections 2933.21 .to 2933.31, inclusive, Revised Code, discloses that none of them are applicable to inspections such as provided for- here, and they add no light to this problem except to show that, if entry were to be denied except upon production of a search warrant if demanded, further legislation would be necessary.
The right of a home owner to the inviolability of his “castle” should be subordinate to the general health and safety of the, community wherein he lives. Certainly this ordinance does not contemplate the invasion of the privacy of the home, and, as applied to the relator hero, the record confirms the reasonableness of the Housing Inspector’s actions.
We, therefore, conclude that an ordinance establishing minimum standards “governing utilities, facilities and other physical things and conditions essential to make dwellings safe, sanitary and fit for human habitation,” and “governing the conditions and maintenance of dwellings,” and containing a provision which authorizes a housing inspector to make inspections of “dwellings, dwelling units, rooming houses, rooming units and premises located within the city” and which also authorizes such inspector “upon showing appropriate identification * * * to enter, examine ,and survey at any reasonable hour all dwellings” and which requires that the “owner or occupant of every dwelling” shall give such inspector “free access to such dwelling * * * at any reasonable hour, for the purpose of such inspection, examination and survey,” with penalties of fine or imprisonment or both for violation of such provision, is not violative of Section 14 of Article I of the Ohio Constitution prohibiting unreasonable searches and seizures.
Accordingly, the judgment of the Court of Appeals is affirmed.

Judgment affirmed.

Weygandt, C. J., Zimmerman, Stewart, Taet, Matthias and Bell, JJ., concur.